HAMLIN, Justice.
 

 In the exercise of our supervisory jurisdiction (Art. VII, Sec. 11, La.Const. of 1921) we directed limited certiorari to the Court of Appeal, Third Circuit, in order that we might review its judgment áffirming a judgment of the trial court which fixed and adjudged the rights of plaintiffs and defendants under certain agreements designated as the “Erath Agreements.”
 
 [1]
 

 Texaco Inc., Operator of the Erath Unit of the Erath Field, Vermilion Parish, instituted the present declaratory judgment proceedings (LSA-R.S. 13:4231-4246, now incorporated in Arts. 1871-1883, LSA-C.C.P.); it prayed for a judicial interpretation of the Erath Agreements, infra, and asked that such interpretation decree that a certain sand known as the “School Board Sand,” infra, was covered by the agreements.
 

 Defendants, approximately six hundred persons, were all parties having an interest in the royalties, leases, minerals, and lands included in the Erath Unit; it comprised some eighty-three tracts of land with a surface area of over four thousand acres.
 

 The matter involved concerned the Erath Field; it contained tremendous quantities of oil and gas bearing sands. The original discoverers holding leases in the unit area concluded that the best method of developing these resources would be through a recycling plant, and the Erath Agreements were formulated by a committee of geologists, petroleum engineers, experts in the oil industry, and attorneys representing the operators, royalty owners, and land owners
 
 *413
 
 in order to carry out the proj ect. The Erath Unit was established in 1942 by two agreements which constituted the Erath Agreements; one was known as the “Royalty Owners Unitization Agreement” and was executed by the owners of royalty and other interests, and the other was termed the “Unit Operating Agreement” and was executed by the owners of operating interests and working interests. Both agreements were executed and became effective at the same time, their purposes were the same, and they were interrelated and complementary to each other.
 

 As provided in the agreements, the recycling unit was established by January 1, 1944, at an alleged cost of between $3,500,-000.00 and $4,000,000.00.
 
 [2]
 
 The Erath Agreement unitized eighteen producing sands encountered in twenty-nine wells, eleven being pre-unit wells and eighteen being drilled before 1944 below 8,000 feet. The agreements adopted the acre-foot formula as a basis for the participation of each tract in unit production and costs and in unit operation and management. By this method the hydrocarbons in place under the unit as a whole are calculated as well as the hydrocarbons in place under each tract, and each tract is allocated an equity which its underlying hydrocarbon content bears to the total hydrocarbons in place under the entire unit. A final calculation of equities had to be made at a date not later than June 1, 1944.
 
 [3]
 

 The equities were calculated (Revised Exhibit D), and the Erath Unit operated within the eighteen producing sands for approximately twelve years.
 

 In 1956 one of the existing unit wells on the Vermilion Parish School Board Tract (part of the Erath Field and north of the Fault Line) was deepened and completed in a sand known as the “School Board Sand” at an interval of 11,784 to 11,822 feet, Schlumberger measurements. This sand is sometimes referred to as the “Nineteenth Sand.” The Department of Conservation, State of Louisiana, issued clarification orders with respect to the exploration for and production of gas and condensate from
 
 *415
 
 the School Board Sand of the Erath Field (Order 34 — F). The Vermilion Parish School Board and other parties owning interests in the tracts overlying the School Board Sand would not recognize the sand as included in the Erath Agreements, and they declined to accept payment on account of production from that sand on a unitized basis.
 

 Texaco Inc., as stated supra, instituted the present suit'; after hearing and submission of the matter on briefs, the trial court interpreted the Erath Agreements on the issues presented and held in part:
 

 “(1)
 

 ‘‘The- School Board Sand as defined in Conservation Department Order No. 34 — F; dated December. 19, 1956. * * * is cov.e'red by' the Erath Agreements, as amended, 'as are all sands below 8000 feet located-beneath the Unit area as delineated by said agreements and containing 'unitized substances’ defined in Article-1(b) of said Erath Agreements, whether or not said sands and reservoirs were known or unknown at the time, of the confection of such agreements;
 

 “(2)
 

 . “The percentage of equities allocated to each numbered tract of the Unit Area, expressed in Exhibit ‘D’ of said agreements as finally amended, * * * has application only to those sands and reservoirs located in the Unit Area known to cpntain unitized substances capable of being produced commercially on and as of June 1, 1944.
 

 “(3)
 

 “Said percentage of equities as expressed June 1, 1944, does not apply to the SchooL Board Sand Reservoir containing unitized substances discovered in 19S6 north of the fault line lying i-n the north portion of the Unit Area * * * nor does it apply to any other like sands and reservoirs in said Unit Area below 8,000 feet which were not known and discovered as commercially productive horizons as of June 1, 1944.
 

 “(4)
 

 “The -Unit Operating Committee, subject to approval of the Commissioner of Conservation of the State- of Louisiana, is expressly charged with the power, and duty to calculate the percentage of equity of each tract lying in the Unit Area north of the fault line * * * using the method and formula set out in Article IV of the Royalty Owners Agreement, and in Article V(1) of the Unit Operating Agreement applicable to known reservoirs in June, 1942 and 1944, and the participation in production from said reservoir by parties having interests
 
 *417
 
 in the tracts north of the fault line is to be governed accordingly; it being held that only those parties having interests in tracts within the Unit Area overlying the School Board Sand Reservoir north of the fault line shall participate in production from said reservoir.
 

 “(5)‘
 

 . “All sands and reservoirs containing unitized substances as defined in said agreements capable of being produced commercially and located below 8000 feet from the surface of the earth, not known and determined in June, 1942, or June, 1944, which may be hereafter placed in production, are to be similarly calculated and treated.
 

 “(6)
 

 “The provisions of Article XI (3), (11), (12), and (13) of the Unit Operating Agreement are held to be applicable to such new sands and reservoirs containing unitized substances hereafter placed on production in the unit area, including the School Board Sand north of the fault line shown on Plaintiff’s Exhibit P-B, and the grant of express and implied powers of said Unit Operating Committee therein set out is held to include the giving of notices to all interested parties of such calculations and adjustments as may be or hereafter become necessary hereunder for the purpose of carrying out the objects of said Erath Agreements for the benefit of all parties in interest, in keeping with the views herein expressed.”
 

 After the Court of Appeal affirmed the foregoing judgment,' Texaco Inc., Tidewater Oil Company, Grace Goldston Barber,' et al., Humble Oil & Refining Company, and Phillips Petroleum Company separately applied to this Court for Certiorari. Writs were granted, limited to a review of these two questions:
 

 “1. Whether royalties from the School Board Sand should be paid
 

 “a. On the basis of a recalculation of the equity of' each tract in the whole Erath Unit, or
 

 “b. On the basis of a calculation of the percentage of equity of each tract shown on Plaintiff’s Exhibit P-B to be lying in the Unit Area North of the fault line.
 

 “2. Whether the percentage of equity in all sands and reservoirs containing unitized substances not known and determined to be productive in June, 1944, which may hereafter be placed in production, are to be calculated according to judgment to be rendered herein.”
 

 The following specification of errors was assigned in this Court by Texaco Inc. and those parties alligned with it:
 

 
 *419
 
 “1. Since it has been finally determined herein that the School Board Sand and such general sands as may hereafter he encountered below 8000 feet are unitized sands and covered by the Erath Agreements, it was entirely inconsistent to hold and the Court of Appeal erred in holding, that production from such sands belongs entirely to the tracts overlying the same to the exclusion of all other tracts in the Unit Area.
 

 “2.
 
 The Court of Appeal erred in so segregating and allocating the production from the School Board Sand and the other sands in question, as the express provisions of the Erath Agreements are to the contrary.
 

 “3. The judgment of the Court of Appeal is erroneous, as it creates foreign bodies within the Unit Area which are so incompatible with the general unit plan of joint operation and common ownership as to render it impossible to develop and operate the segregated sands as part of the larger unit either separately or with relation to other unitized sands. ■
 

 “4.
 
 The Court of Appeal erred in ruling that production from certain sands unitized by the Erath Agreements must be awarded on a non-unitized basis when the parties themselves did not so plead or contend in this case, did not offer an iota of evidence in support thereof, and never envisioned such a concept as a legal possibility in this suit.
 

 “5. The Court of Appeal erred in failing to hold that the recalculated equities as set forth on Revised Exhibit D of the Erath Agreements govern all unit production for the entire life of the Recycling Unit whether obtained from the named sands or from any other unitized sand thereafter encountered.
 

 “(Alternative)
 

 “6. In the event it is held that the recalculated equities of Revised Exhibit D do not fix participation in unit production for the life of the unit, the Court of Appeal erred in failing to hold that the equities for the entire Recycling Unit are to be determined by adding the value of the School Board Sand to the equities shown on Revised Exhibit D, and making such adjustment in the tract equities for the, field as will result from allocating the increased equity represented by the School Board Sand to the tracts overlying the same.
 

 “7.
 
 And said court erred in failing to adopt the same formula with respect to any other unitized sand hereafter encountered.”
 

 Vermilion Parish School Board, et al. urge in this Court that the manner of dis
 
 *421
 
 tributing the School Board Sand production ordered by the Court of Appeal is fair and equitable and conforms with the intent of the parties to the unit agreements, and that it should be confirmed.
 
 [4]
 

 Because of our limited review, the only matters for determination before this Court are the basis of payment of royalties and the effect of such determination on the payment of royalties on reservoirs discovered in the future from sands now unknown.
 

 Bearing the above matters in mind, we cannot help but observe the following insoluble problems that counsel for Texaco Inc. have set forth in brief and which they state would not have gone unanswered if the contracting parties had intended to segregate certain sands of the agreements as decreed by the Court of Appeal:
 

 “1. Are the costs of drilling and developing the School Board Sand and of processing and recycling production therefrom to be borne entirely by the tracts overlying that sand, or by the entire unit?
 

 “2. If such costs are to be borne entirely by the tracts overlying the School Board Sand, how can joint unit costs which are applicable to all tracts in the unit be divided and separately allocated according to sands?
 

 “3. If costs relating to the School Board Sand are to be borne by the entire unit, does the School Board Sand bear its proportion of costs of operation and production elsewhere in the Unit Area?
 

 “4. If costs relating to the School Board Sand are to be apportioned on a unit-wide basis, how can the percentages of those costs for the tracts overlying the School Board Sand be determined, considering that, under the Court’s ruling, the School Board Sand is a segregated sand and has no percentage value in the unit as a whole?
 

 “5. How can the same cost determination be made for the remaining tracts in the unit with respect to the School Board Sand?
 

 “6.
 
 Assuming such percentage factors could be determined and such costs allocated on a unit wide basis, how will the Court preserve the balance between costs and production as provided in the agreements considering that all production from the School Board Sand is allocated to the tracts overlying that sand?
 

 
 *423
 

 “7.
 
 Since unit operations and management are governed by voting interest, will the School Board Sand have a voting interest in operations elsewhere on the unit, and will the remaining tracts of the unit have a voting interest in operations relating to the School Board Sand?
 

 “8. How will the voting interests of each be calculated, considering that the School Board Sand does not represent a percentage interest in the whole unit ?
 

 “9.
 
 How can the separate ownership of Unitized Substances produced from the School Board Sand be preserved if such substances are injected into other formations, and how can the unit wide ownership of Unitized Substances produced from elsewhere in the Unit Area be preserved if such substances are injected into the School Board Sand?
 

 “10. If pressure maintenance is needed in the School Board Sand to properly develop that sand and to insure the greatest ultimate recovery of Unitized Substances therefrom, how will the problems stated in 9 be coped with ?
 

 “11. Can the leases within the entire Unit Area be
 
 legally
 
 preserved if the only unit production being obtained is from the-School Board Sand and the only operations being had are in. connection with that sand ?
 

 “12. If the School Board Sand should be the last producing sand, would the payment of royalties therefrom to the owners of the overlying tracts constitute full performance of
 
 all obligations,
 
 to pay royalties, and maintain the unit agreements in force on the entire Unit Area?
 

 “13. Will distribution of production from the School Board Sand to the tracts overlying that sand interrupt prescription on mineral and royalty interests elsewhere in the unit which are not otherwise receiving unit payments or being otherwise exercised?
 

 “14. In the event of loss of interest in any tract overlying the School Board Sand, how will it be possible to translate that loss, insofar as the School Board Sand is concerned, into a percentage interest in the entire unit as required by the agreements?”
 

 The above problems or questions are serious beyond doubt; to ignore all of them, and to allow the judgment of the Court of Appeal to stand, would lead to an unreasonable, inequitable, or absurd result.
 

 “Since persons may be expected to contract with one another on a basis equitable to each, a contract should not be given a construction that will work a hardship on one of the parties, where this may be.avoided without defeating, in whole or in part, the intention of the
 
 *425
 
 parties at the time of the execution of the agreement.” Coyle v. Louisiana Gas & Fuel Co., 175 La. 990, 144 So. 737, 742.
 

 “In interpreting the contract, it is, of course, of primary importance discover whether its provisions are clearly set forth and that they express the true intention of the parties. And, even if. the words used are fairly explicit, it is our duty to refrain from construing them in such a manner as to lead to absurd consequences. See Article 1945 of the Civil Code. * * * ” Bondio v. Joseph Binder, Inc., La.App., 24 So.2d 398.
 

 “Where a contract is capable of a construction in accordance with justice and fair dealing, the court will adopt such construction, instead of one entailing loss to a party to the contract. * * * ” Syllabus, Ascension Red Cypress Co., Ltd. v. New River Drainage Dist., 149 La. 764, 90 So. 165.
 

 “ * * * the general rule of law is that the intent must be gathered from the language of the instrument itself, and the contract should be enforced unless such enforcement would lead to absurd consequences, R.C.C. art. 1945, par. 3.” Lama v. Manale, 218 La. 511, 50 So.2d 15, 23 A.L.R.2d 1312.
 

 . “It is ■ elementary that in the interpretation of a contract the court must give legal effect to the instrument according to the true intent of all the parties, and such intent is to 'be determined by the words used therein", without the aid of extrinsic evidence, when these are clear and explicit and lead to no absurd consequence. Revised Civil Code, Article Í945; * * Gulf Refining Co. v. Garrett, 209 La. 674, 25 So.2d 329.
 

 “Where a contract is capable of construction in accordance with .justice and fair dealing, the court will adopt such construction, instead of one entaiL ing loss to a party to the contract. Civil Code, art. 1951. * * * ” Terrell v. Alexandria Auto Co., Inc., 12 La.App. 625, 125 So. 757.
 

 “We know that a contract is the law between the parties and that they -are bound by their agreements regardless of harmful consequences, provided the agreement is not contra bones mores or in violation of some prohibitory law. However, where the issue is as in the instant case — what are "the terms of the verbal agreement — the fact that informed and experienced persons do not usually and customarily bind themselves to unjust and" unreasonable obligations is a serious factor that must be taken into consideration in determining that question.” Oil Field Supply & Scrap Material Co. v. Gifford Hill & Co., 204 La. 929, 16 So.2d 483, 484.
 

 
 *427
 
 “ *
 
 * *
 
 The intention of the parties is of paramount importance and must be determined in accordance with plain, ordinary and popular sense of the language used in the agreement and by giving consideration on a practical, reasonable and fair basis to the instrument in its entirety. * * * ” McKinney v. American Security Life Insurance Co., La.App., 76 So.2d 630.
 

 “Article 1945 of the Civil Code provides that agreements have the effect of law upon the parties, who alone can abrogate or modify them, and that the courts are bound to give effect to all contracts according to the true intent of the parties when the language is clear and leads to no absurd consequences. Conformable with this principle, which is also stated in Article 1901 of the Code, this Court has many times observed that it is not with [in] its province to alter or make new contracts for the parties, its duty being confined to the interpretation of the agreements the parties have made for themselves, and, in the absence of any ground for denying enforcement, to render them effective. Moriarty v. Weiss, 196 La. 34, 198 So. 643; Texas Co. v. State Mineral Board, 216 La. 742, 44 So.2d 841.” Stack v. De Soto Properties, 221 La. 384, 59 So.2d 428.
 

 Guided by the above jurisprudence and codal interpretations, as well as a study of the Erath Agreements (the pertinent articles of which are set out in the opinion of the Court of Appeal, 145 So.2d 383), it becomes obvious that the trial court and the Court of Appeal were correct in finding that:
 

 “ ‘The entire purport of the agreements was and is to insure for each landowner the value of the minerals in place under his land, then known to exist
 
 and to be discovered thereafter below 8000 feet.’ ”
 
 (145 So.2d p. 388) (Emphasis ours.)
 

 From the foregoing finding, it follows that the parties to the Erath Agreements intended that production from any sand, whether it be then existent or discovered in the future, was to be attributed to the whole of the Unit Area; otherwise, the interpretation of the agreements would be unreasonable and the intentions of the parties would be negated.
 

 It is manifest from a study of the record that the parties to the Erath Agreements were experienced and informed persons who contemplated justice and fair dealing with one another; they did not, and could not have contemplated independent units within a unitized area such as the Erath Field. To interpret the agreements as providing that production should be attributed to any
 
 *429
 
 thing other than the whole would lead to absurd and inequitable consequences never intended.
 

 Production and costs are interrelated and must be determined by experts in those fields; costs arc allocated to and associated with production. Where as in the present case a unitized field exists and production is general and cumulative, costs are to be proportionate according to formulas adopted by experts and agreed upon by the parties.
 

 As to the division of royalties, an examination of the agreements (set forth in the Court of Appeal Decision) discloses that the parties thereto intended that each would receive his fair and equitable share of the products recovered.
 

 It is pertinent here to observe that Relator Texaco Inc. states in brief:
 

 “We respectfully submit that the judgment of the Court of Appeal to the extent that it awards production from the School Board Sand, and any other unitized sand later encountered, to the overlying tracts is clearly violative of the Erath Agreements, and should be reversed and set aside, and, in turn, judgment should be rendered'herein:
 

 “(1) decreeing that the recalculated equities for the entire field as reflected by Revised Exhibit D govern production of Unitized Substances from the Erath Unit for all time, including production from the named sands, the School Board Sand and any other unitized sand as may be later encountered within the Unit Area.
 

 “Alternatively.
 

 “(2) decreeing that the equities for the entire Recycling Unit are to be determined by adding the School Board Sand to the equities shown on Revised Exhibit D, and making such adjustment in the tract equities for the field as will result from allocating to the tracts overlying the School Board Sand the increased equity
 
 in the unit
 
 represented thereby; and
 

 “(3) decreeing that the same method of recalculation will apply to any other unitized sand as may hereafter be encountered within the Unit Area.”
 

 It is also pertinent to note.that Vermilion Parish School Board states in brief:
 
 [5]
 

 
 *431
 
 “ALTERNATIVE SUGGESTION AS TO DISTRIBUTION OF SCHOOL BOARD -LAND PRODUCTION
 

 “Appellee suggests, as an alternative method for distributing the School Board, sand production, that all equities be recalculated by using the percentages shown on revised Exhibit ‘D’ and in making such unit-wide adjustments as will result from adding the value of the total mineral content of the School Board .sand to the .total mineral content and value of. the unit and crediting the tracts,overlying the School Board sand with the. increased equity represented thereby.. * * .
 

 The adoption of the alternate plan seems to be the equitable and reasonable soliiti'on to this controversy without working a hardship upon the parties. We therefore find that' á reasonable distribution for the equities , .derived from- the School Board Sand would be a recalculation of all equities by .using.the.percentages shown on Revised Exhibit D, and making such unit-wide adjustments as would result from adding the value of the School Board Sand to the total unit value and crediting the overlying tracts with the increased equity represented by that sand.
 

 For the reasons assigned, the judgment of the Court of Appeal, Third Circuit, is reversed and set aside, insofar as it affirms the judgment of the trial court with respect to the royalties herein concerned; insofar as it pertains to matters not treated herein because of our limited review, the judgment of the Court of Appeal is not disturbed.
 

 It is now ordered and decreed that the equities for the entire Recycling Unit are to be determined in accordance with the alternate plan, supra, by adding the School Board Sand to the equities shown on Revised Exhibit D, and making such adjustment in the tract equities for the field as will result from • allocating to the tracts' overlying the ’School Board Sand, the increased equity in the unit represented thereby. It is further ordered that this, same method of recalculation apply to any other unitized sand as may hereafter be encountered within the Unit Area.
 

 All costs to be paid by petitioner, Texaco Inc., Unit Operator of the Erath Unit.
 

 SUMMERS, J., recused.
 

 [1]
 

 . La.App.,
 
 145
 
 So.2d 383.
 

 [2]
 

 . The record discloses that by the recycling process gas is produced from the unitized sands, the desirable hydrocarbon fractions are extracted therefrom, and the residue gas is then returned to such of the unitized formations as the operator may select for the purpose. This enables the operator to store gas awaiting a favorable market, and it also maintains reservoir pressures near their original values, thereby preventing loss from condensation and from water intrusion in the sands which would result from diminishing pressures. It is alleged that at the time the unit was created, the expert opinion was that the recycling operation would result in the recovery of 133 million barrels of plant product, 50% of which would otherwise be lost, and in the saving of 1.5 trillion cubic feet of gas for the day when a favorable market would be available.
 

 [3]
 

 . Prom a statement of the case of Relator, Texaco Inc. See, also, Art. IV, “Royalty Owners Unitization Agreement.”
 

 [4]
 

 . On March 27, 1963, counsel for Vermilion Parish School Board filed a motion asking that this Court issue an order limiting the argument to be presented by plaintiffs-appellants in this matter to Specification of Errors Nos. 6 and 7, and to tbe limited questions specified by this Court to be presented on this writ of review. They further requested that Specification of Errors Nos. 1, 2, 3, 4 and 5 be stricken from Texaco Inc.’s brief.
 

 [5]
 

 . Phillips Petroleum Company (Applicant in No. 46,444), Humble Oil & Refining Company (Applicant in No. 46,446), Grace Goldston Barber, et al. (Applicants in No. 46,447), and Tidewater Oil Company (Applicant in No. 46,450) have joined with Texaco Inc.; John L. Abercrombie, et al., have joined with Vermilion Parish School Board, et al. In view of the foregoing, one decree will suffice.