HAMLIN, Justice:
In this declaratory judgment proceeding, certiorari was directed to the Court of Appeal, Third Circuit, for the purpose of review of its judgment which interpreted a lease contract in accordance with plaintiff’s prayer and affirmed the judgment of the trial court. Art. VII, Sec. 11, La.Const. of 1921; 253 La. 733, 219 So.2d 513; La.App., 218 So.2d 346.
The facts of the case are correctly recited by the Court of Appeal as follows:
“On September 20, 1963, plaintiff and defendants entered into a written lease contract, under the terms of which plaintiff leased to defendants a building in Alexandria, Louisiana to be used by defendants for the operation of a grocery store. The lease stipulates that it is for a primary term of five years, and that the lessees have the right to renew or to extend it for an additional period of five years. [The lease has been renewed.]
“Defendants occupied and. jointly operated a grocery store in the building from the date the lease was executed until sometime later- when Stinson assigned his interest in the lease to Fairbanks. After that assignment was made, Fairbanks has continued to occupy the building and to operate a grocery store in it. Fairbanks, therefore, is the principal defendant, although the suit was instituted against both of the original lessees.
“The premises leased to defendants is described in the lease contract as follows:
“ 'That certain brick and wood building owned by Lessor and presently occupied by him as a grocery store, said building being located on the property of Lessor at the corner of Jackson Street and Texas Avenue in the City of Alexandria, and bearing Municipal No. 3306 Jackson Street, said building being located on the property shown in heavy blue lines on the attached plat of survey.’
“Attached to the lease is the plat of survey which is referred to in the description of the leased premises. This plat shows the entire tract of land which was owned by plaintiff near that street intersection at the time the agreement was entered into. According to that plat, the land then owned by the Lessor is located near the intersection of Texas Avenue and Jackson Street.. It is bounded on the east by Texas Avenue, having a frontage of 167.07 feet' on that thoroughfare, and *172 it is bounded on the south by Jackson Street, with a frontage of 248.55 feet on that street. The building described in the lease is located in the southeastern part of that lot.
"On ■ March 20, 1964, or about six months after the above mentioned lease contract was entered into, plaintiff acquired from James N. Chambers a parcel of land which is located north of and adjacent to the lot on which the leased building is located. This parcel of land has a frontage of 50 feet on Texas Avenue, with a depth of 160 feet. About two years after the Chambers property was acquired, plaintiff decided to construct a shopping center on the property owned by him at that intersection. In connection with and as a part of that project he proposed to erect a new building for use as a grocery store, his purpose being to require defendant to move-into the new building pursuant to the above quoted provisions of the lease contract.[1] Giamanco, through his attorney,. *174 formally notified defendant Fairbanks on August 29, and again on September 16, 1966, of his plan to construct such a building, and he informed defendant that upon completion of the new building he would call upon him to transfer all of his grocery store operations into the new building, following which the old store building then being occupied by defendant would be demolished.
“The new building which plaintiff plans to construct for defendant’s use is to be located partly on the original lot of ground which plaintiff owned when the lease was entered into, and partly on the new parcel of land which he acquired from Chambers. The building is designed to face south. It is to be 50 feet wide and 60 feet deep, and its east wall will be located 40 feet from the right of way of Texas Avenue. The front 22 feet of the building will be on the original lot which was owned by plaintiff when the lease was executed, and the rear 38 feet of it will be on the parcel of land which plaintiff later acquired from Chambers. The rear 10 feet of the building will be partitioned off and plaintiff will retain the use of that area. He intends, however, to require defendant to move his grocery store operations into the remainder of the building, extending from the front of it to a depth of 50 feet.
“Plaintiff began construction of the new building shortly after he notified defendant of his plan to do so. While it was being constructed, defendant advised plaintiff that the new building was not being built in accordance with the above quoted provisions of the lease, and he stated that for that reason he would not move into the new structure after the construction was completed. * * * The record indicates that construction of the building was discontinued until the issues presented * * * could be determined.
“The record shows that the front of the building which plaintiff proposes to construct will be 145 feet from the intersection of Jackson Street and Texas Avenue. If a new building of the size required in the contract should be constructed entirely on the lot originally owned by plaintiff, but along its rear line, all as defendant contends is required, then the front of that building would be 117 feet from the intersection * * *”
Plaintiff instituted the present suit, in which he prayed for judgment decreeing *176 that the new building conforms to the lease agreement and that defendant be obligated to move into it.
The trial court decreed that the proposed building conforms to the lease agreement, and that after its completion defendant Fairbanks would be obligated to move his business operations into it.[2]
The Court of Appeal affirmed the judgment of the trial court and concluded:
“Our conclusion, like that of the trial judge, is that the parties intended that the new store building was to be located as far back from Jackson Street as possible. They did not intend that the building, was to be constructed wholly on plaintiff’s original tract of land or that the back wall of the building had to be ‘along’ the north boundary of that original tract.” [3]
■ Herein, Fairbanks contends that the decision of the Court of Appeal is based upon one word, “across,” taken out of context from the lease and the Court therefore failed to construe the contract as a whole and in the light of conditions and circumstances existing at the time of its execution. He further contends that the Court did not find the true intent of the parties, and that when terms present two meanings they must be taken in the sense most congruous to the matter of the contract.
Plaintiff prays that the decision of the Court of Appeal be affirmed.
*178 ' We have read the testimony of record, which was properly admitted to explain the ambiguities in the instant lease and to show the intentions of the parties ■ at the time of its execution, LSA-R.C.C.Art. 2276, and we find it substantially contradictory.
Lessor, Sebastian Giamanco, testified that at the time of the execution of the lease he had previously attempted to buy" the Chambers property but had not been successful because of a defect in its title. He said that in discussions among him, Fairbanks, and Stinson, with respect to the lease, he advised them of the proposed development of his property. He told them of his efforts to purchase all or part of the Chambers property. The lease was executed on September 20, 1963; the Chambers property was purchased on March 20, 1964, After acquisition, Giamanco had a number of discussions with Fairbanks as to the location of the new grocery store; no accord could be reached. The shell of the new store was constructed partially on the controversial property. No positive re-' sponse could be secured from Fairbanks - with respect to moving; Giamanco said that Fairbanks objected to.the cost of moving, as well as to the locale of the new store. Giamanco instituted the present suit to settle the controversy; his interpretation of the lease contract was to the effect that it permitted him to build the new store partially on property owned at the time of the execution of the lease and partially on the subsequently acquired property. He said that he saw no necessity for inserting such a- provision in the lease. With' respect to hardship, he testified:
“Q. Do you still want Mr. Fairbanks to move into this building that you have proposed and for which you have started construction?
“A. Yes, sir, because my development, is on a standstill, I’m tied, I can’t move.
“Q. Why can’t you move, why can’t with the development of your shopping center, why can’t the present grocery store stay where it is?
“A. Because nobody wants a building in the back of another building, he’s blocked — I had a man — this shell that I call it, I have a sign there 'for lease’ part or whole, the man say I take it in a minute but that store is in the way and I had several people tell me that and I know it myself, that’s the reason why I took this step to relocate the store and demolish the building, get the building out of the way so I could continue on with my development.-
“Q. Are you .willing at this time to go forward with your obligations under the lease to build the new building and complete it for Mr. Fairbanks if he would agree to moye in- . to it? . .... /
*180 “A. I always did and I will to yet, there is no disagreement on my part, that’s in the contract, trying to fulfill my contract.”
Lessee, Clifton Alexander Fairbanks, Jr., testified that the only time he knew of his lessor’s interest in the Chambers property was after the lessor had purchased it. With respect to the development of the lessor’s property by the acquisition of the Chambers property, Fairbanks denied that such was ever discussed. When asked why he objected to moving back to the proposed site, he said “Well my interpretation of the contract is that I will be on — I will have built for me a building that is on his original property that we leased, now this building is off of the original property on someone else’s property which we could go back further if he decided to buy any more land behind that, but we leased the store and the property in the agreement that we would move back, Jay and I did, but only that we would go back on his original property. In fact I didn’t know there was any other property sought after or investigated at the time, so there was just one piece of property that was in our minds at the time of the lease and that was his original property.” His testimony with respect to his reasons for not wanting to move is as follows:
“Q. There must be some reason and that’s what I want — the reasons, but to say it’s not in the terms of the lease, now that may be why you can’t put it there but that’s not the reason.
“A. It’s further from Jackson.
“Q. How about the cost of the moving?
“A. Cost would be considerable but the moving itself to a deeper location is primarily my reason.
“Q. You say that moving is your primary reason — a deeper location, what do you mean by that?
“A. To move further back.
“Q. Would do what?
“A. It would lessen my business.
“Q. You would lose business on account of it?
“A. I would lose business, yes, sir.”
On cross-examination, Fairbanks was. asked, “ * * * isn’t it as you say what it all boils down to, you just don’t want to move at all, isn’t that it?” He replied, “Yes, sir, I’d rather stay up front.”
Fairbanks further testified that moving-to the proposed location would convert his convenience type store, known as “Jiffy Pak,” into a supermarket business. His: concluding testimony was as follows:
“Q. And as I understand it the reasons,, to summarize your reasons if I cam *182 'Mr. Fairbanks, the" reason why you don’t want to move is one, you don’t think that you are obligated to move into this building under the terms of what you say the lease is.
“A. Correct.
*‘Q. And beyond that it is going to cost you some money to move which you don’t want to pay.
■“A. Correct.
■“Q. Let me ask you this — if you moved into a building that was built entirely on the same property, on the original property entirely on the original property, you’d have the same moving cost wouldn’t you?
"A. Correct.
■“Q. If you moved into a building that had a depth of 40 feet and built entirely on the original property, it would be only 18 feet closer to Jackson Street, wouldn’t it?
'“A. Yes, sir.
'“Q. And that in your opinion would not be a supermarket type operation.
'“A. No, sir, it would just give me one more or two more car lengths.
■“Q. But moving 127 feet doesn’t make you a super store but moving 145 does ?
. “A. Correct.”
The recording machine malfunctioned, and none of the testimony of the Lessee, James A. Stinson, was recorded. A narrative of facts signed by the trial judge recites in part:
“He further testified he had no knowledge that Mr. Giamanco acquired any other property and there was no mention made either prior to the lease or at the time of the execution of the lease about the lease covering any other property than that owned by Mr. Giamanco at the time of the execution of the lease and as shown on the plat.
“This witness testified that he had never discussed with Mr. Giamanco that he, Mr. Giamanco, might buy any other property and that the first he knew about the so-called Chambers property, or the additional 50 feet in the rear of the original tract was after Mr. Giamanco had purchased it.
“The witness further testified the further the front of the store was placed from Jackson Street the more it would hinder business and would affect the operation of the store.
“On cross examination Mr. Stinson stated that moving the store from its present location of 36 feet 8 inches from Jackson Street to a distance of 117 feet from Jackson Street would not change *184 the nature of the store from- a - convenience ty-pe store to a supermarket type store, but that moving it from its present location of-36 feet 8 inches from Jackson Street to a distance of 145 feet from Jackson Street would change the character and type of the store.”
In the case of Texaco, Inc. v. Vermilion Parish School Board, 244 La. 408, 152 So.2d 541, 547, we set forth the following rules for interpreting contracts such as the instant one:
“ ‘Since persons may be expected to contract with one another on a basis equitable to each, a contract should not be given a construction that will work a hardship on one of the parties, where this may be avoided without defeating, in whole, or in part, the intention of the parties at the time of the execution of the agreement.’ Coyle v. Louisiana Gas & Fuel Co., 175 La. 990, 144 So. 737, 742.
“ ‘In interpreting the contract, it is, of course, of primary importance to discovery whether its provisions are clearly set forth and that they express the true intention of the parties. And, even if the words used are fairly explicit, it is our duty to refrain from construing them in such a manner as to lead to absurd consequences. See Article 1945 'of the Civil Code. * * *’ Bondio v. Joseph Binder, Inc., La.App., 24 So.2d 398.
“ ‘Where a contract is capable of á construction- in' accordance with justice and fair deáling, the court "will adopt such construction, instead of- one entailing loss to a party to the contract * * * ’ Syllabus, Ascension Red Cypress Co. Ltd. v. New River Drainage Dist., 149 La. 764, 90 So. 165.
“ ‘ * * the general rule of law is that the intent must be gathered from the language of the instrument itself, and the contract should be enforced unless such enforcement would lead to absurd consequences, R.C.C. art. 1945 par. 3.’ Lama v. Manale, 218 La. 511, 50 So.2d 15, 23 A.L.R.2d 1312.
“ ‘It is elementary that in the interpretation of a contract the court must give legal effect to the instrument according to the true intent of all the parties, and such intent is to be determined by the words used therein, without the aid of extrinsic evidence, when these.are clear and explicit and lead to no absurd consequence. Revised Civil Code, Article 1945; * * * ’ Gulf Refining Co. v. Garrett, 209 La. 674, 25 So.2d 329.
“ ‘Where a contract is capable of construction in accordance with justice and •fair dealing, the court will adopt such construction, instead of one entailing loss to a party to the contract. Civil Code, art. 1951. * * *’ Terrell v. Alexandria Auto Co., Inc., 12 La.App. 625, 125 So. 757.
“ ‘We know that a contract is the law between the parties and that they are *186 bound by their agreements regardless of harmful consequences, provided ' the agreement is not contra bones mores or in violation of some prohibitory law. However, where the issue is ás in the instant case — what are the terms of the verbal agreement — the fact that informed and experienced persons do not usually and customarily bind themselves to unjust and unreasonable obligations is a serious factor that must be taken into consideration in determining that question.5 Oil Field Supply & Scrap Material Co. v. Gifford Hill & Co, 204 La. 929, 16 So.2d 483, 484.
“ ‘ * * * The intention of the parties is of paramount importance and must be determined in accordance with plain, ordinary and popular sense of the language used in the agreement and by giving ■ consideration on a practical, reasonable and fair basis to the instrument in its entirety. * * * ’ McKinney v. American Security Life Insurance Co. La.App., 76 So.2d 630.
“ ‘Article 1945 of the Civil Code provides that agreements have the effect of law upon the parties, who alone can abrogate or modify them, and that the courts are bound- to give effect to all contracts according to the true intent of the parties when the language is clear and leads to no absurd consequences. Conformable with this principle, which is also stated in Article 1901 of the Code, this Court has many times observed that it is not with [in] its province to alter or make new contracts for the parties, its duty being confined to the interpretation of the agreements the parties have made for themselves, and, in the absence of any ground for denying enforcement, to render them effective. Moriarty v. Weiss, 196 La. 34, 198 So. 643; Texas Co. v. State Mineral Board, 216 La. 742, 44 So.2d 841.’ Stack v. DeSoto Properties, 221 La. 384, 59 So.2d 428.”
Under the evidence, facts, and circumstances of this case, we do not find that the interpretation of the instant lease should be limited to a strict grammatical construction. LSA-R.C.C. Art. 1946. The word “across” employed in the clause “the building that will be used for a grocery store will be located across the rear line of the property” is not clear and explicit in the context in which it is recited.[4] Its *188 interpretation requires a consideration of all clauses of the lease agreement. LSA-R.C.C. Art. 1955.
Plaintiff has affirmatively shown that if he is not permitted to build the new grocery store partially on the property he owned at the time of the execution of the lease and partially on the property he subsequently acquired from Chambers, he will suffer a financial and economic hardship; .a delay of approximately four years (the period which the renewed lease has to run) will stymie his shopping center development. He has also clearly illustrated that the location proposed by Fairbanks for the new grocery store will destroy the symmetry of the contemplated buildings of the planned center.
Fairbanks has not shown with certainty that the location proposed by Giamanco will be a deterrent to his business; his asserted loss of business is speculative. His assertions with' respect to supermarket transition are also speculative; nowhere in the contract of lease is there any mention of a convenience store; the lease contract merely recites that the premises will .be used for a retail grocery store. Fairbanks’ testimony reflects that he does not want
to move; that he does not ■ welcome the expense and inconvenience of moving. The contract of lease specifically recites that he shall move, and that there shall be a month’s rent compensation for moving expenses.
We conclude that as between Giamanco and Fairbanks, Giamanco will suffer the greatest loss and hardship if he is restrained from following the building plan he proposes. We find that it was not the intention of the parties to the lease to bring about such an unjust, impracticable and unreasonable result. We further find that the contract taken as a whole, all clauses interpreted one by the other, LSA-R.C.C. Art. 1955, does not prohibit the construction of a new grocery store partially on the property owned by Giamanco at the time of the execution of the lease and partially on the property subsequently acquired by him from Chambers. This is a logical and just conclusion and gives effect to the obvious intention of the parties. St. Ann v. American Insurance Companies, La.App., 182 So.2d 710. It is congruous to the matter of the lease contract. LSA-R.C.C. Art. 1952.
*190 For the reasons assigned, the judgment of the Court of Appeal, Third Circuit, is affirmed. All costs to he borne by defendants.
SUMMERS, J., concurs.

. The pertinent provisions of the lease contract recite :
“It is agreed and understood that Lessor may at any time he desires during the term of this lease undertake to construct on the property shown on the plat of survey attached hereto and made a part hereof other commercial buildings. In such event, Lessor may elect to construct a building for use as a grocery store, which building will have a minimum area of two thousand (2000) square feet for sales and five hundred (500) square feet for storeroom space and will be of the same general type of construction as the existing building covered by this lease. In the event Lessor desires to undertake this construction, the building that will be used for a grocery store will he located across the real line of the property. shown on the attached plat of survey and will have a depth of a minimum of forty (40) feet and maximum of fifty (50) feet. The building that Lessor may construct for use as a grocery store will be located so that its wall nearest Texas Avenue will be located no more than sixty (60) feet from the right of way of Texas Avenue.. Such a building will be constructed by Lessor only in connection with the development of the remainder of Lessor’s property for a shopping center, arid if it is so constructed Lessee will have the use, but not the exclusive use, of all of the area reserved for parking area in the shopping center for the use of Lessee and its customers, * * * If Lessor elects to construct a grocery store building, as soon as said building is completed Lessee will immediately move his business operations to the new building, which will thereafter be' substituted for the existing building under this lease and Lessee’s occupancy of the new building will be subject to all the terms and conditions of this lease. In such event, Lessee will be obligated to move to the new building at his sole cost and expense, but to assist Lessee in paying for such cost, Lessor agrees that Lessee can occupy the new building for one month without payment of any rent. As soon as Lessee has’vacated the existing building, Lessor will commence the destruction of the existing building so as to provide additional parking area for the use of Lessee and other occupants of the building presently located or to be located in the shopping center and Lessee agrees that he will finish the destruction of said building as rapidly as possible, with a maximum time for the completion of the demolition of no more than sixty (60) days. Subject to the restrictions described above, the exact size and location of the new building to be construction[ed] *174 shall be determined entirely by Lessor and nothing contained herein shall be construed as imposing on.Lessor any obliga.tjon to construct this new. building. The provisions of this paragraph shall become applicable only in the event Lessor desires to undertake such contruction during the term of this lease.” (Emphasis ours.)

. The trial court said:
“The law is that a party may do anything that he wants to with his property so long as there are not any restrictions. The only restriction in this ease would be the lease existing between the parties. The sole question for decision then is whether or not the lease prohibits (not permits) the plaintiff from constructing, the grocery store in accordance with his present plans.
“A reading of the lease as a whole with the testimony of' the parties does not in the' writer’s opinion prohibit the construction as proposed by the plaintiff.
“The recital in the lease that the building was to be across the back property line is acknowledgment by both parties that the .grocery store was to. be. moved as far back as it possibly could be. If it were the intent of the parties to limit the 'distance' that the grocery store was to be moved back then it - should have been recited in the lease that it was only to be moved back a distance of 50,- 60, 80 or 100, or whatever distance the defendant was agreeable to. I do not believe that any of the parties at the time of the execution of the lease specifically intended that there was to be any specific . restrictions as to the distance that the building was to be moved back from Jackson Street.”

. The court also stated:
“In the instant suit we agree with the trial judge that the parties, by including the above quoted language in the contract, intended that the new store building was to be located as far back from Jackson Street as possible in order to allow the maximum amount of parking space. If the parties had intended that the new building was to be located entirely on plaintiff’s' original tract, and that the back of that building was to be ‘along’ or adjacent to the north property line of the original tract, we think some language to that effect would have been 'used. For instance, such terms as ‘along’ or ‘bordering on’ or ‘against’ or ‘adjacent to’ would have been used instead of the word ‘across” 218 So.2d 351.

. 1 C.J.S. p. 921, defines “Across” as follows:
“An ambiguous term, wbicb varies in meaning according to the context and subject matter. The word has been construed to include, not the entire distance from side to side, but only a portion, determined by the declared intention of the parties to a contract, or by the legislative intention in a statute. The word has been defined or employed as meaning: athwart, crosswise, from side to side, or quite over; in a direction opposed to the length; upon; within. In some instances the word has been equivalent to or interchangeable with ‘in and through,’ *188 or ‘in and upon,’, or ‘over,’ or ‘upon and along.’
“Phrases: ‘Across, along and upon,’ ‘across any public road,’- ‘across the highways and public ways,’ ‘across the street,’ ‘across the waters of any bay,’ ‘across the waters of the stream,’ ‘along and across,’ ‘in, along, over and across any highway,’ ‘over and across the ferry,’ ‘over, under and across,’ ‘through and across,’ and ‘upon or across any water course, private or plank road.’ ” See, White v. Bevier Coal Co., 364 Mo. 313, 261 S.W.2d 81.