PRICE, Judge.
Plaintiff, Continental Nut Company, filed this suit claiming damages in the amount of $12,000 for the alleged failure of defendant, Louisiana Pecan Shelling Company, to comply with a contract for sale of pecans. We reversed the judgment of the trial court sustaining an exception of no cause of action in a prior appeal reported at 279 So.2d 260 and remanded the case for further proceedings. After trial on the merits the district court rendered judgment dismissing plaintiff’s demands and rejecting a reconventional demand filed by defendant subsequent to the remand. Plaintiff has perfected this devolu-tive appeal from the judgment. No appeal has been taken or answer filed by defendant asking for review of the dismissal of its reconventional demands.
The issue presented on trial and appeal is whether the transaction which gives rise to this litigation was an executory contract of sale which was breached by defendant upon its refusal to replace the quantity of pecans delivered which were alleged to not meet the grade specified in plaintiff’s purchase order, or did the parties intend that the obligations to buy or sell would terminate if the pecans were not certified Grade No. 1 by the U. S. Department of Agriculture inspector on delivery in California.
In resolving this issue the trial judge gave written reasons for judgment which contain a very complete presentation of the factual background and review of all transactions between the parties on which this litigation is based.
We find it appropriate in this instance to adopt the following pertinent excerpts *492 from his reasons which we find concisely and accurately depict the operative facts as shown by the record:
'‘The evidence shows that plaintiff, Continental Nut Company, a California corporation, is engaged in the business of purchasing large quantities of pecans from various pecan processing plants through the Nation, and in turn packaging the nuts in smaller quantities for resale to retail outlets. The defendant, Louisiana Pecan Shelling Company of Mansfield, De Soto Parish, Louisiana, is a cooperative corporation engaged in processing from its pecan-grower members, all nuts produced by them, which are then sold in large quantities to nut companies throughout the Nation, such as the plaintiff herein.
“The history of the parties litigant doing business with each other began with a letter of introduction dated October 6, 1969, written by Mr. Riemer Calhoun, President of the defendant company, addressed to Plaintiff. This letter merely stated the nature of Defendant’s business and solicited the Plaintiff’s business for orders and deliveries as agreed upon. The Plaintiff, by letter dated October 8, 1969, declared that it would be interested in having Defendant give quotation on ‘U. S. No. 1 Extra Large and U. S. No. 1 Large Pecans, both natural bleached and polished and red dyed and polished. Quotation should be in truckloads, delivered our plant in Chico, California and each load must be accompanied by a U.S.D.A. grade certificate.’ The Defendant by letter dated October 17, 1969 replied to Plaintiff’s letter of October 8th in which it explained the general time for commencement of harvesting the new crop, and time for delivery of orders, and the method of shipment, but there is one significant statement contained in this letter which is quoted as follows:
“ ‘Because the nearest USDA Inspectors are located 320 miles from our area, it is not practical for us to furnish USDA Certificates but we can sell on the basis of our shipments passing the USDA Inspectors.’ (Emphasis supplied)
“Following the aforesaid exchange of correspondence, by letter dated October 27, 1969 the Plaintiff placed an order with the Defendant, significant excerpts being quoted as follows:
“ ‘We confirm that we have purchased and you have sold one truck 40,000# net weight on arrival, U. S. No. 1 Inshell Pecans Natural Bleached and Polished at 39j/á$ per pound net delivered our plant Chico, California. The Pecans are to be graded both Large and Extra Large with the two grades being bagged and marked separately.
“ ‘As we stressed to you, we pack under U.S.D.A. Continuous Inspection, the truck will be unloaded onto pallets, samples will be pulled by the U.S.D.A. Inspectors whose grade judgment is to be final. In the event the Pecans do not come up to U. S. No. 1 grade then the load would belong to you.’
“The evidence discloses that the sale was consummated and the pecans were paid for as agreed to by the parties after the pecans had passed government inspection at Plaintiff’s plant in Chico, California.
“No other business occurred between the parties, except for one exchange of letters which appears to have no particular significance, until on or about October 9, 1970, a telephone conversation occurred between the parties (who placed the call not being established) at which time it is alleged by the Plaintiff, it ‘bought and he sold two truckloads of pecans.’ Following this telephone order, Plaintiff forwarded its purchase order No. 11714 dated October 12, 1970 which contains, under ‘Remarks’ the following typed words: ‘This confirming phone conversation Friday, October 9, between Mr. Riemer Calhoun and Mr. Kyle Shaw.’
“This purchase order provides that the shipping date will be ‘last week October, *493 first week November, 1970’ and further provides under quantity, ‘2 loads; under Unit ‘400’; under Ship Via, ‘Truck’ and contains under Description the following:
‘bags each — estimated to be 40 to 50% Extra Large, 50 to 60% Large Blend Pecans. All Extra Large to be bleached and red polished, all Large to be natural bleached and polished.
‘Extra Large at 500; Large at 50^ net delivered Chico.
‘Shipment last week October, first week November, 1970.
‘All to be U. S. No. 1 Grade on arrival Chico.
‘The two sizes are to be bagged separately and so marked.’
“A portion of the printed purchase order form contains the following provision:
‘Buyer reserves the right to cancel orders for goods not shipped at specified time, goods not as ordered or not equal to sample, will be returned at the shipper’s expense.’
‘Payment was stipulated ‘Net Cash — 10 days.’
“On or about November 6, 1970, Plaintiff’s representative, Kyle Shaw, by tele-' phone, contacted Mr. Calhoun, President of the defendant company, and was advised by Mr. Calhoun that one load was shipped on November 6, 1970, and that the other load would be shipped by November 11th or 12th, and the original scheduled delivery date could not be maintained because he was delayed in harvesting.
“The first load shipped under purchase order #11714 arrived in California, passed government inspection and was paid for by the Plaintiff.
“The second load shipped under purchase order #11714 arrived in California on or about November 16, 1970 and was government inspected on or about that date, but this load failed to pass inspection, and Plaintiff notified Defendant promptly of the fact by telephone conversation on November 16, 1970, and Plaintiff also by letter dated November 19, 1970 informed Defendant that the second load failed to pass inspection, and asked Defendant to make immediate shipment of the replacement load at the contract price.
“Defendant did not make a written acceptance of Plaintiff’s order #11714 but did declare verbally and by making shipment of the two loads ordered of his intent to fill the order.
“Plaintiff, following the notification that the second load failed to pass inspection, contacted his driver in California, and following some hasty arrangements with another California buyer, sold part of the load to him and had the balance of the load returned to its plant in Mansfield, Louisiana.
“Defendant claims that when first contacted by telephone about the failure to pass inspection that it informed Plaintiff that it was impossible to find better pecans. By letter dated December 9, 1970, Defendant informed Plaintiff that it was unable to furnish better pecans than those offered. By letter dated December 15, 1970, the Plaintiff made formal demand upon Defendant to comply with the contractual agreement by shipping the load and grade of pecans as ordered.
“By letter dated December 19, 1970, the Defendant advised Plaintiff that it did not intend to make any further effort toward satisfying Plaintiff. By letter dated January 5, 1971, the Plaintiff again made demand upon Defendant for immediate delivery of the load as previously ordered, rather than have Plaintiff resort to buying on the open market for Defendant’s account. The Defendant did not reply to the latter letter. By letter dated February 1, 1971, the Plaintiff again made demand for delivery of the order under the threat of legal action. Plaintiff replied to the latter letter on February 9, 1971, in which it explained *494 Defendant’s position about the whole matter and suggested that Plaintiff take the matter to court if it so desired.
“The Plaintiff thereafter, on August 4, 1971, purchased from another supplier, but the market price had advanced to 700 per pound, and it is this increased price which it is attempting to recover in this present suit, plus other expenses which it claims as damages for breach of contract.”
The trial court found from the evidence presented that the “obligation of sale was contracted on a suspensive condition in that it was dependent upon a future and uncertain event, namely, the affirmative certificate as to grade by an independent government inspector, and not dependent on the will or control of either party to the agreement, and was not an absolute warranty by • the seller, and accordingly, the sale was not finalized.” The court further found that the transaction was either a sale with a suspensive or resolutory condition.
Plaintiff contends the trial court was in error in its interpretation of the agreement between the parties as the defendant contracted to furnish plaintiff at its plant in Chico, California, the stipulated quantity of pecans of No. 1 quality and having failed to do so is liable for the damages occasioned by it as a result of this breach of contract. Plaintiff contends the provision that the pecans be inspected by U. S. Government inspectors at its plant was to assure proper compliance with defendant’s obligation to deliver nuts of the specified quality and was not a condition on which the obligations of the parties depended.
In support of its position plaintiff cites Pepper v. Katz, 77 So.2d 891 (La.App.Orl.1955); Salasnek Fisheries v. Morgan City Packing Co., 55 So.2d 627 (La.App. 1st Cir. 1951); United Suriname Trading Company v. C. B. Fox Company, 242 So.2d 259 (La.App. 4th Cir. 1970); Penick & Ford v. Lagarde Co., 146 La. 511, 83 So. 787 (1919).
We understand these cases are authority for the principle that a seller is liable for the damages for nonperformance of an obligation to furnish the specified quality and quantity of a product he has agreed to furnish a buyer at a particular time. However, we do not find them to resolve the question presented here as the cases relied on involved executory contracts to buy and sell and did not involve a question of sales with suspensive conditions.
There is no formal written instrument containing the agreements of the parties in this instance. The subject contract consists of the series of telephone conversations confirmed by plaintiff’s written purchase order.
In concluding the circumstances presented constituted a sale with a suspensive condition, the trial judge relied on the decision in Coco v. Nolin, 56 So.2d 204 (La.App. 2nd Cir. 151), decided by this court. In that case a purchaser of dallis grass seed was absolved from liability for refusing to pay for seed delivered by the plaintiff as the seed failed to pass the statutory germination test. The court there found no contract of sale was to take effect until the subject seed were verified by the testing laboratory. Since the buyer had not consented to accept the seller’s offer to sell until the seed was tested, this made the sale subject to a suspensive condition.
Although there are certain factual variances from the matter at hand, we find sufficient analogy to consider the case to support the result reached by the trial court.
We conclude, as did the trial judge, that from a review of all the communications between the parties leading up to the written purchase order submitted by plaintiff on October 12, 1970, it is apparent the offer and acceptance was based on the pecans passing inspection after arrival at Chico.
*495 Prior to the first sale made to plaintiff in 1969, defendant replied to plaintiffs inquiry as follows:
“Because the nearest U.S.D.A. Inspectors are located 320 miles from our area, it is not practical for us to furnish U.S.D.A. Certificates but we can sell on the basis of our shipments passing the U.S.D.A. Inspection.” (emphasis supplied)
A reply letter from plaintiff on October 17, 1969, would seem to accept such a condition as it states:
“In the event the Pecans do not come up to U. S. No. 1 Grade then the load would belong to you.”
The purchase order of plaintiff in the transaction at issue appears to reiterate these conditions. It specifies “all to be U. S. No. 1 Grade on arrival Chico”, and further states “Goods not as ordered or not equal to sample, will be returned at shipper's expense.” (emphasis supplied)
We find the evidence to show that plaintiff’s Vice-President of sales and marketing, Kyle Shaw, possessed full information that the defendant lacked the capability to guarantee that pecans shipped by it would definitely be certified as U. S. No. 1 grade. Both he and Mr. Calhoun, defendant’s president, who negotiated the transactions with plaintiff, had many years of experience in the pecan marketing industry. Under the circumstances shown it would have been unreasonable and illogical to find that Calhoun would have intended to obligate the defendant to ship multiple loads of pecans at a shipping cost of $1,500 per load to California to comply with the terms of the agreement as contended by plaintiff herein.
In the case of Oil Field Supply & Scrap Material Co., v. Gifford Hill & Co., 204 La. 929, 16 So.2d 483 (1943), the Supreme Court expressed the following rule on interpretation of contracts.
“We know that a contract is the law between the parties and that they are bound by their agreements regardless of harmful consequences, provided the agreement is not contra bones mores or in violation of some prohibitory law. However, where the issue is as in the instant case — what are the terms of the verbal agreement — the fact that informed and experienced persons do not usually and customarily bind themselves to unjust and unreasonable obligations is a serious factor that must be taken into consideration in determining that question.”
This rule has been followed in Texaco, Inc. v. Vermillion Parish School Board, 244 La. 408, 152 So.2d 541 (1963); J. H. Jenkins Contractor, Inc. v. City of Denham Springs, 216 So.2d 549 (La.App. 1st Cir. 1968); East Contract Supply, Inc. v. Petite Paree Fashions, Inc., 250 So.2d 839 (La.App. 4th Cir. 1971).
The evidence indicates to us that plaintiff anticipated a shipment might not be certified by government inspectors and took particular care in its correspondence and purchase order to specify that until such time the pecans had been inspected they were at the risk of and belonged to defendant. Plaintiff’s purchase order provided for the return shipping costs to be absorbed by defendant should the pecans not pass inspection. This we believe to be the measure of damage the parties intended to flow from any failure of the pecans to be certified on inspection. Any other result would be harsh and unreasonable.
Plaintiff cites and relies on the provisions of La.Civil Code art. 2474 in its argument that any ambiguity in the extent of the obligations of the seller must be construed against him as this article provides the seller is bound to explain himself clearly respecting the extent of his obligations.
Article 2474 is contained in Section 3 of Chapter 6 of the Code relating to *496 vices in the thing sold which the seller has concealed from the buyer. Therefore, we are of the opinion the rule expressed in the cited article is limited to provisions in an agreement relating to warranty and is not a general rule for interpretation of contractual obligations. Furthermore, the last written instrument forming a part of the contract between the parties is the purchase order prepared by plaintiff’s employees which contributes to the doubt or uncertainty which exists in their understanding and any ambiguity contained in this instrument would be subject to the rule that such ambiguity should be construed against the one who confected it as provided by La.Civil Code art. 2027.
For the foregoing reasons the judgment appealed from is affirmed at appellant’s costs.