MARTHINSON v. KING et al.

(Circuit Court of Appeals, Fifth Circuit. November 3, 1906.)

No. 1,542.

1. SPECIFIC PERFORMANCE—OPTIONS.

Where an owner of property gives another a written option for a valuable consideration, agreeing to sell it to him at a fixed price if accepted within a specified time, such option is binding on the owner and on a purchaser from him, with knowledge thereof, and in a proper case may be specifically enforced.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 51–53, 178.]

**2. VENDOR AND PURCHASER—STANDING TREES.**

Trees growing on land constitute a part of the realty as provided by Ga. Code 1895, § 3045.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Property, § 4.]

**3. SPECIFIC PERFORMANCE—ADEQUATE REMEDY AT LAW.**

Complainant procured an option from defendant K. in consideration of $1,000, to purchase a cross-tie camp and outfit, together with certain growing timber, for $6,923.57, whereupon complainant gave a similar option to defendant lumber company to purchase the same outfit for $14,295. Defendant K. thereafter refused to perform his option to plaintiff, but sold the outfit direct to the lumber company, by which plaintiff alleged that he lost a net profit of $6,371.43. *Held,* that in the absence ·of any allegation that either K. or the lumber company were insolvent, complainant had an adequate remedy at law, and was not entitled to compel specific performance of his option.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 5–8.]

**4. SAME—DISCRETION.**

The granting of specific performance is not a matter of arbitrary discretion, but of judicial discretion controlled by principles of equity exercised on consideration of all the circumstances of the particular case.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 17, 18.]

**5. EQUITY—JURISDICTION—ALLEGATIONS.**

Equity jurisdiction cannot be invoked by mere charges of fraud, conspiracy, prayers for injunction,. and the cancellation of deeds as a cloud on title.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 323–330.]

**6. SAME.**

The defense of adequate remedy at law is one of substance in the national courts affecting the jurisdiction, and may, therefore, be raised at any stage of the proceedings, either by the parties, or the court of its own volition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 19, Equity, §§ 173–176.]

**7. COSTS—IN EQUITABLE CASES—DIVISION.**

Where, in a suit for specific performance in a federal court, defendant raised the question of adequate remedy at law by answer. but did not call the court's attention thereto until final hearing on the merits, after large costs had been incurred in the taking of testimony, the court on sustaining such defense should have directed that a part of the costs should be taxed to defendants.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Costs, § 262.]

Appeal from the Circuit Court of the United States for the Southern District of Georgia.

T. P. Ravenel, W. G. Charlton, and Livingston Kenan, for appellant. Samuel B. Adams, for appellee N. B. King.

Before PARDEE and SHELBY, Circuit Judges, and MEEK, District Judge.

SHELBY, Circuit Judge. The main purpose of the bill in this case is to enforce the specific performance of a contract. The suit is brought by Charles Marthinson, an alien and a subject of the King of Denmark, against N. B. King, a citizen of Georgia, and the Hall

150 F.—4

Tie & Lumber Company, a Virginia corporation. On the 16th day of July, 1903, two contracts were made. To understand this controversy it is necessary to state the substance and purpose of both of them. The first contract is between Charles Marthinson, the plaintiff, and N. B. King, one of the defendants. By its terms, in consideration of $1,000 which Marthinson paid to King, and the further sum of $6,923.57, to be paid on August 1st following, King sells, or agrees to sell, to Marthinson a cross-tie camp and outfit, all the growing timber on certain described lots, 12 buildings, 4 mules, a certain mortgage against J. M. Revels, and other property specifically described in the contract. It is provided that King was to execute no transfer of the property until all of the purchase money was paid in full, and that in case of default of payment of all the purchase money King was to retain the property and also the money paid to him in advance. Such is the substance of the contract sought to be enforced in this suit.

On the same day, July 16, 1903, the other contract was made between Charles Marthinson, the plaintiff, and the other defendant, the Hall Tie & Lumber Company. This contract recites that Marthinson had previously given the company an option to purchase the outfit and property described in the foregoing contract of sale between King and Marthinson, and that such option had been extended in consideration of $200. In consideration of $1,000 paid by the company to Marthinson, the latter agreed to extend this option to August 1, 1903. The company was to pay Marthinson in all $14,295 for the property described in the first contract. Both contracts are in writing, and each is attested by two witnesses. For convenience of reference, they are copied in a footnote. It appears from the two contracts that, if both had been carried out according to their terms, Marthinson would have made a profit of $6,371.43 on the transaction. The bill alleges the execution of both contracts, and that all the parties to the suit had actual notice of both; that on the 1st day of August, 1903, the plaintiff and an agent of the company met in the city of Savannah for the purpose of closing these trades; and that the plaintiff was then ready and willing and able to pay N. B. King the balance of the purchase money agreed to be paid, but that King failed to be present and refused to carry out his contract. It is also alleged that a representative of the company was then present, willing and ready to pay the plaintiff $14,295 for the property, according to the agreement, and that the failure and bad faith of King "has resulted in great loss and damage to your orator; for by and under the terms of his purchase from King and sale to said Hall Tie & Lumber Company your orator would have realized a net profit of $6,371.43." It was then alleged that King, having failed to carry out his contract with the plaintiff, conveyed the property directly to the Hall Tie & Lumber Company, and that such conveyance was made "in order to defeat and defraud your orator out of all of the aforesaid property to which he was and is justly entitled under said contracts with said King, and out of the profits which he would realize out of the said trades touching said property, and in order to themselves profit by their said fraud," etc.; and it is alleged that all this is "contrary to equity and good conscience, and works a manifest wrong, injury, and irreparable loss to

your orator in the premises." In the eighth paragraph of the bill it is alleged that the plaintiff is remediless by the strict rules of the .common law, and is only relievable in a court of equity. The plaintiff makes a tender to King of the balance of the purchase money, which tender is to continue during the pendency of the suit. The bill contains a prayer that the court should require "King to execute and deliver to the plaintiff a good and sufficient title to the property, and that the transfer or pretended transfer between King and the Hall Tie & Lumber Company should be canceled. There is also a prayer that the defendants be enjoined from selling or disposing of any of the property and from cutting or removing the timber from the premises. The bill contains no averments as to the insolvency of either of the defendants.

The defendants filed a joint answer to all the paragraphs of the bill. In answer to the eighth paragraph they averred that each of them is solvent and amply responsive in damages; that each of them owns property in the state of Georgia more than sufficient to pay the sum claimed by the plaintiff; that the defendant company has large interests in the state of Virginia, North Carolina, and other states, and in this connection they expressly deny plaintiff's allegation as to his damage being irreparable. On the contrary, they aver that:

"His remedy is ample at common law, and that they have abundant property to meet any judgment that he may recover against them, or either of them."

The case was tried on the merits, much evidence being taken and offered on both sides, and the court rendered a final decree dismissing the bill and remitting the plaintiff to his remedy at law. The plaintiff has appealed to this court, and assigns that the court below erred in dismissing the bill.

1. Whenever a contract is of such a form and nature that it has mutually executory promises, or whenever it is intended that it should require future acts or omissions from each of the parties, and that each should be bound to perform his stipulated part, there must be both mutuality of obligation and of remedy. It follows that, as a general rule governing cases for specific performance, the contract must be mutual, and either party is entitled to the equitable remedy of a specific performance. But when the contract is unilateral, and by its express terms is binding upon one of the parties only, it may, of course, be specifically enforced against that party, although the remedy cannot be granted to him against the other. Pomeroy on Specific Performance of Contracts, § 169. It is now well settled that if an owner of property gives another a written option on it for a valuable consideration, agreeing to sell it to him at a fixed price, if accepted within a specified time, it is binding upon the owner, and it is equally binding upon those who purchase from the owner with a knowledge of such agreement. In a proper case the courts will not hesitate to enforce an option as readily as they enforce other contracts. Johnston v. Trippe (C. C.) 33 Fed. 530; Black v. Maddox, 104 Ga. 157, 30 S. E. 723; Ross v. Parks, 93 Ala. 153, 8 South. 368, 11 L. R. A. 148, 30 Am. St. Rep. 47. Conceding, therefore, that the contract between

the appellant and King was an option, that fact would not prevent its specific enforcement.

2. Part of the property involved here is personal property, and part is classed as real estate. Trees growing on land constitute part of the realty. Douglass v. Bunn, 110 Ga. 159–162, 35 S. E. 339; Ga. Code 1895, § 3045. It is true that the courts will sometimes specifically enforce a contract concerning land when it would refuse to enforce one in the same terms relating to personal property. In a contract for the purchase of merchandise, where there is nothing to impress a peculiar value upon the identical articles, the purchaser can go into the market and buy other articles of the same kind with the damages he may recover at law, and so his loss would be fully compensated. But a landed estate, though of precisely the same value as another, may be entirely different in other circumstances that make it an object of desire to the purchaser. It has, therefore, become a rule governing ordinary contracts relating to landed estates, when such contracts contain none of the circumstances which appeal to the discretion of the court, that it is as much a matter of course for a court of equity to enforce them as it is for a court of law to give damages for the breach of them. It should be borne in mind, however, that no distinction inheres in the nature of land and chattels, and that the fundamental principles which control the action of the court are the same whether the contract relates to realty or personalty; for we find that where chattels have some peculiar value to their owner over and above any market value which could be placed on them in accordance with strict legal rules—such as an heirloom, a painting, or other work of art—contracts concerning them will be specifically enforced in equity. Although the trees described in the contract considered here are a part of the realty, they having been purchased with a view to their severance and sale, the contract cannot be looked on as embracing a landed estate that makes it an object of desire to the purchaser, giving it a value not to be estimated in damages.

In Paddock v. Davenport, 107 N. C. 710, 12 S. E. 464, it was held that where trees are bought with a view to their severance from the soil, thus being converted into personalty, and there are no circumstances from which it can be inferred that breach of the contract may not be readily compensated for in damages, specific performance will not lie. Certainly this doctrine should apply where the contract sought to be enforced, together with the pleadings of the plaintiff, show that he himself has put an exact estimate upon the amount of damage he has suffered by the breach of the contract. When we remember that a court of equity will enforce a contract relating to a work of art on the same principles that it will enforce one relating to a landed estate, the case of Dowling v. Bitjemann, 2 John. & H. 544, s. c. 8 Jur. (N. S.) 538, becomes worthy of attention here. This was a suit by an artist seeking to obtain possession of a picture. It was conceded that a court of equity had undisputed jurisdiction to order the delivery of a painting when it has a special value, and that the legal remedy is therefore inadequate; but, as his agreement and his pleadings showed that the artist had himself put a fixed price on the picture, it was held that damages would, under these circumstances, be an adequate reme-

dy, and that there was no necessity for interference by an equity tribunal. This case is quoted by Pomeroy, and the proposition of his own text amounts to this: That a party by his own acts may put a certain value on a unique chattel which can be recovered at law, and which, being his own estimate, will be taken as sufficient compensation. Pomeroy on Specific Performance of Contracts, p. 17, note 2.

We can see no reason why this principle is not equally applicable to a case where the plaintiff puts a certain value on chattels and trees to be severed by estimating to a cent the amount he has lost by the failure of the defendant to transfer them to him.

3. The granting of the equitable remedy of specific performance is a matter of discretion—not of an arbitrary discretion synonymous with the mere pleasure of a judge, but of a judicial discretion controlled by principles of equity exercised upon consideration of all the circumstances of the particular case. In determining a particular case, the question of granting a specific performance often turns upon collateral incidents connected with and shedding light on the contract sought to be enforced. Both the contracts to which this suit relates are made parts of the bill. They really constitute a single transaction; both being necessary to show the nature and extent of the plaintiff's loss. The company held an option on the property comprising the subject of the suit, which had been once extended. It desired to obtain another extension. The three parties, the plaintiff and the two defendants, with the knowledge of all, on the same day made the two contracts. King, who had the title to the property, sold, or agreed to sell, it to Marthinson, the plaintiff, for $1,000 cash, the remainder of the price to be paid later. King was to hold the title till all the price was paid. Marthinson, at the same time, extended the company's option, and sold, or agreed to sell, the property at a larger price to the company, receiving $1,000 in cash (which presumably he used in paying King), the remainder of the purchase money to be paid at a later date. By the contracts King was to convey to Marthinson and Marthinson was to convey to the company. The result of the performance of both agreements would have been that the company would have had the title to the property and Marthinson would have made the difference between what he paid King and the larger price he received from the company. Marthinson was a middleman, to receive and pass the title on to the company. His true relation to the sale was similar to that of a broker representing the vendor and vendee. The difference in the buying and the selling price was his pay. Instead of doing as he agreed, King ignored the plaintiff and conveyed direct to the company. He put the title, however, where the agreements provided it should go. Assuming the averments of the bill to be true, he conspired with the other defendant, violated his obligation, and cheated the plaintiff out of the profits to which he was entitled, which is a sum certain—the difference between plaintiff's buying price and his selling price. All this had occurred before the bill was filed. The plaintiff, by the terms of the two contracts, acquired no right to hold the title to the property permanently. He was to take it and pass it on to the company. He was not, therefore, when the bill was filed, entitled to have the title vested in him, to remain

in him. What he really was entitled to was the amount of his damages—his lost profits—taking the averments of the bill as true. Both defendants being solvent, his remedy at law was ample and adequate when the bill was filed. It is true, as argued by the appellant, that in a suit which properly invokes equitable jurisdiction the court will go on and do complete justice, though in its progress it may decree on a matter which was cognizable at law. Cathcart v. Robinson, 5 Pet. 264, 8 L. Ed. 120. Under this rule, if the bill had made a case of which a court of equity had jurisdiction and in which the plaintiff would have been entitled to relief, and some subsequent event had made it impossible for him to have obtained relief by specific performance, the case might have been retained to assess damages. But the appellant's claim for a decree for damages cannot be sustained in this case because the bill does not show a case for specific performance or for any equitable relief. Section 723, Rev. St. U. S. [U. S. Comp. St. 1901, p. 583], provides that:

"Suits in equity shall not be sustained in either of the courts of the United States where a plain, adequate and complete remedy may be had at law."

As Judge Pardee observed in Zeringue v. Texas & P. R. Co. (C. C.) 34 Fed. 239, 243:

"Under no head of chancery jurisdiction can a court of the United States sustain a bill in equity to obtain only a decree for the payment of money by way of damages when the like amount can be recovered at law."

4. As to other averments which it is claimed confer jurisdiction in equity, it is only necessary to say that charges of fraud and conspiracy and prayers for injunctions and the cancellation of deeds as a cloud on title do not confer jurisdiction in equity, when the bill, taken as a whole, shows that the remedy at law is complete and adequate. If it were otherwise, a defendant could be deprived, by a mere form of pleading, of the constitutional right to a trial by jury which he has in "all suits at common law where the value in controversy shall exceed twenty dollars."

5. It is often said that, unless the objection that the plaintiff has a perfect remedy at law is raised as a preliminary question, it will be regarded as waived. But the defense of good remedy at law is one of substance in the national courts, and one affecting the jurisdiction of the court in equity, and it may, therefore, be raised at any stage of the proceedings, or, in a case like this, the court may raise it of its own volition. In this case, the defect appearing on the face of the bill, the objection should have been raised by demurrer. One of the purposes of raising such question by demurrer is "to prevent an unnecessary expense." Story's Equity Pleadings, § 447. The defendants raised the question by answer, and the attention of the court was not called to it, so far as appears from the orders and decrees, till the final hearing on the merits. Before the court came to pass on the question a mass of testimony had been taken on the merits, involving large costs. If the defendants had raised the question by demurrer, this expense would have been avoided, for the court would have held, as the learned judge did hold when the case was heard, that the remedy at law was adequate.

Under these circumstances, we think that the defendants should be taxed with the part of the costs incurred by them in the Circuit Court, and the decree will be amended to that effect. The appellant will pay the costs of the appeal. The decree of the Circuit Court, as amended, is affirmed.

### NOTE.

"Savannah, Ga., July 16, 1903.

"For and in consideration of the sum of one thousand dollars ($1000.00) to me in hand paid by Charles Marthinson, at and before signing hereof, the receipt whereof I hereby acknowledge, and for the other consideration hereinafter stated, I hereby sell to said Charles Marthinson the following property, consisting of my crosstie camp and outfit, located in 2nd land district of Charlton County, Georgia, and itemized as follows: All timber on lots numbers seventy-one, one hundred and twenty-one, one hundred and twenty-two, one hundred and twenty-three, one hundred and thirty-three, one hundred and thirty-four and one hundred and thirty-five, with lease of five years from January 1st, 1903, to cut and remove said timber; twelve buildings, four mules, three wagons and harness, my lease of siding, stock of goods in commissary, loading ropes, saddle and bridle, extra collar, twenty sacks of corn, ten sacks of oats, twelve bales of hay, horse, buggy and harness.

"The price for entire outfit to be seven thousand six hundred and three dollars and fifty-seven cents ($7603.57), payable as follows: One thousand dollars ($1000) in cash now, as above receipted for, and balance in cash on or before August 1st, 1903.

"It being understood that unless the said Charles Marthinson shall pay to me on or before the 1st of August, next, the sum of six thousand six hundred and three dollars and fifty seven cents ($6603.57), which is balance due on this purchase, then the sum of one thousand dollars now paid to me shall be forfeited and retained by me without any accounting. In other words, I am not to make or execute the papers transferring said property until all of purchase money is paid in full, and in case of default of payment I am to retain all of said property and also the money now paid to me as above receipted, and this agreement becomes null and void.

"It is also agreed and understood between said Charles Marthinson and myself that when final settlement is made and papers executed, the said Charles Marthinson shall, in addition to above purchase pay to me the sum of three hundred and twenty dollars ($320.00) for which I will transfer to him a mortgage which I hold against J. M. Revels, for three mules and one timber cart and fixtures, together with said Revels' obligation to work out the mortgage debt on same—as verbally understood between said Revels and myself.

"[Signed]                                                      N. B. King.

"Witness:

"W. G. Guyton.
"Richard Burry."

"Savannah, Ga., July 16, 1903.

"Whereas I gave to Hall Tie & Lumber Company under date of July 7, 1903, an option to purchase the crosstie camp and complete outfit thereto belonging in second land district of Charlton County, Georgia, consisting of lots numbers 71, 122, 123, 133, 134 and 135, together with buildings and tents thereon, siding of railroad, all goods in commissary, four mules, three wagons with harness, with lease to cut and remove said timber any time within five years from January 1, 1903, for the sum of thirteen thousand dollars, payable as set forth in said option and which option was extended to July 20th in a second instrument of writing signed by me, and whereas for above stated option and extension the said Hall Tie & Lumber Company have heretofore paid me the sum of two hundred dollars ($200). Now, therefore, for and in consideration of the sum of one thousand dollars ($1000.00)—more to me in hand paid by said Hall Tie & Lumber Company, at and before signing hereof, the receipt whereof is hereby acknowledged, I hereby agree to extend said option to 1st of August, 1903, and to modify payments as follows: On or before 1st August, 1903, Hall Tie & Lumber Company shall pay to me in cash,

the sum of fifty-three hundred dollars ($5300.00) in addition to amounts already paid on options; and shall execute and deliver to me their notes as follows: One thousand five hundred dollars ($1500) payable in sixty days from date of deed transferring property to them, and the balance of purchase money, same being five thousand dollars ($5000) divided into eight equal parts, payable respectively in three, four, five, six, seven, eight, nine, and ten months from date of said deed. All deferred payments bearing interest at six per cent. per annum and secured by the property, that is to say, I do not release my ownership until all notes are paid.

"And in addition thereto the said company shall purchase and pay in cash, within time named above, for following items, viz.:

| | |
|---|---:|
| "One horse and buggy with harness | $250 00 |
| 750 cross-ties in woods last Saturday | 97 50 |
| Rope for loading logs, saddle and bridle, 30 sacks feed and ——— bales of hay | 60 00 |
| Accounts of 75 men now working | 887 50 |

"Upon settlement as above stated I agree to furnish full * * * clear of all encumbrances, proper documents transferring above property to said Hall Tie & Lumber Company. But it is understood and agreed that in the event of failure of said Hall Tie & Lumber Company to meet the settlements and payments as above set forth on or before the 1st of August, 1903, then all money paid me on options, including the one thousand dollars ($1000) now paid, shall be forfeited by them and retained by me, and this agreement becomes null and void.

"[Signed]                              Chas. Marthinson.
"Witness:
        "W. G. Guyton,
        "Richard Burry."