CONTINENTAL OIL COMPANY

v.

Albert B. CRUTCHER, Jr., J. D. Tufts, II, Crutcher-Tufts Corporation, Clifton A. Cowan, Oran R. Carter, Edward E. Miller, Richard E. Heffner, Charles R. Ward, Robert F. Kennon and Hibernia National Bank.

Civ. A. No. 76–2469.

United States District Court, E. D. Louisiana.

June 29, 1977.

Gene W. Lafitte, John M. Wilson, S. Gene Fendler, Liskow & Lewis, New Orleans, La., for plaintiff.

Joseph E. LeBlanc, Jr., Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, La., for defendants.

## MEMORANDUM OPINION

HEEBE, Chief Judge.

This matter is before the Court on the motion of Continental Oil Company, plaintiff herein ("Continental"), for a preliminary injunction to compel defendants to resume deliveries of natural gas to Continental under a certain gas purchase contract dated April 24, 1972. Defendants terminated performance under that contract on April 1, 1976 when Continental refused to amend or renegotiate the contract following a drastic and unforeseen rise in the price and value of natural gas, which defendants assert was a force majeure event under the contract, and which defendants say destroyed the basic and fundamental assumptions on which the parties contracted.

A hearing was held upon Continental's motion on February 3 and 4, 1977. Based upon the evidence presented, the Court makes the following Findings and Conclusions in support of its decision to deny Continental's request for a preliminary injunction.

## FINDINGS OF FACT

*The Parties*

1. Plaintiff Continental Oil Company ("Continental") is a Delaware corporation having its principal place of business in the State of Texas.

2. Defendant Crutcher-Tufts Corporation ("Crutcher-Tufts") is a Louisiana corporation with its principal place of business in that State; defendant Hibernia National Bank is the testamentary executor of the last will and testament of Gordon I. Atwater, and is a federally chartered banking association located in Orleans Parish, Louisiana, and is a citizen of the State of Louisiana; all other defendants are citizens of the State of Louisiana.

3. Plaintiff, Continental, is an integrated oil and gas producer, refiner, and marketer engaged in oil and gas exploration, production and transportation on a worldwide basis. Continental employs approximately 45,000 employees. Within the State of Louisiana, Continental operates an intrastate gas pipeline known as Continental's "Louisiana Gas System", through which Continental delivers gas to seven industrial users in the Lake Charles area (Olin Corporation, PPG Industries, Inc., Firestone Tire and Rubber Company, Continental Carbon Company, Wanda Petroleum Company, Continental Oil Refinery, and Continental's Petrochemical Facility), and to the Town of Eunice, and to approximately 200 agricultural and individual end users.

4. Defendant, Crutcher-Tufts Corporation, is a small independent company engaged in investment and participation in oil and gas properties, and 90% of whose holdings are located in the Reddell Field, in Evangeline Parish, Louisiana. Crutcher-Tufts is not engaged in the purchase, marketing or transportation of oil and gas, nor in the operation of any natural gas pipeline, and Crutcher-Tufts makes no sales of oil or gas directly to industrial, agricultural, or individual end users. Crutcher-Tufts Corporation is owned and operated by two persons, Albert B. Crutcher, Jr. and J. D. Tufts, II, and employs one clerical employee. The other defendants involved in this proceeding are all individuals.

*Contract Formation*

5. This action involves, *inter alia*, a request by Continental for specific performance of a contract for the sale and purchase of substantial quantities of natural gas on a daily basis, and the amount in controversy greatly exceeds $10,000.00, exclusive of interest and costs.

6. The individual Defendants, as Seller, and Plaintiff, Continental, as Buyer, entered into a gas purchase contract dated April 24, 1972, copy of which is attached to the complaint as Exhibit "A" (Plaintiff Exhibit A) for the sale and delivery of natural gas produced by or for the account of defendants from certain mineral leases and lands located in the Reddell Field, Evangeline Parish, Louisiana, namely, the gas to be produced from the new Wilcox Units "D" well proposed to be drilled by Inexco Oil

Company (Inexco), the Operator within the field. In the contract Crutcher-Tufts Corporation was designated as the Sellers' Representative. The Gas Purchase Contract was Continental's standard form of "Gas Purchase Contract". The contract was amended by instrument dated December 29, 1972, copy of which is attached to the complaint as Exhibit B (Plaintiff Exhibit B). As so amended the contract is herein sometimes called "Gas Purchase Contract" or "the 1972 contract".

7. The Gas Purchase Contract was negotiated by defendant J. D. Tufts on behalf of all defendants. When the contract was made Mr. Tufts had been in the business of exploring for and producing oil and gas for a number of years, and had negotiated contracts for the sale of such gas production, including gas produced in the Reddell Field, in the period from 1963 through May, 1971. (Tufts Testimony, Tr. pp. 23–24; Tufts Affidavit, para. 8).

8. As a part of the contractual arrangements for the sale and purchase of the natural gas under the Gas Purchase Contract, the parties also entered into letter agreements dated April 24, 1972 and January 11, 1973, copies of these agreements being attached to the complaint as Exhibits "C" and "D" (Galbraith Affidavit, Paragraph 2; Plaintiff's Exhibits "C" and "D").

9. In order to understand that the letter agreements providing for "risk money" or "dry hole contributions" represent an effort by Continental to outbid the only other purchaser of gas in the Reddell Field, it is necessary to note that at the time of execution of the 1972 contract there were two purchasers of natural gas within the Reddell Field, Continental and Louisiana Intrastate Gas Corporation ("LIG"). Each offered to pay for defendants' gas the highest price then being paid in the Reddell Field, 28.5 cents per MCF. Continental, in addition, offered to advance to defendants a proportionate cost of drilling and completing the proposed Unit "D" well, and defendants accepted Continental's proposal. Pursuant to the aforesaid letter agreements executed on April 24, 1972 and January 11, 1973, Continental advanced to defendants the sums of $65,000.00 and $77,146.00, respectively. These advances have since been repaid in full by defendants.

10. The contract contains provisions governing those events which will excuse nonperformance under the rubric of force majeure. The force majeure provisions of the contract read as follows:

### ARTICLE VI
### FORCE MAJEURE

1. In the event of either party's being rendered unable wholly or in part by force majeure to carry out its obligations under this contract, other than the obligation to make payments of amounts due hereunder, it is agreed that on such party's giving notice and reasonably full particulars of such force majeure, in writing or by telegraph, to the other party within a reasonable time after the occurrence of such cause relied on, then the obligations of the party giving such notice so far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused, but for no longer period, and such cause shall so far as possible be remedied with all reasonable dispatch.

2. The term "force majeure" as employed herein shall mean acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrest and restraints of the government, either federal or state, civil and military, civil disturbances, explosions, breakage or accident to machinery or lines of pipe, freezing of wells or lines of pipe, inability of any party hereto to obtain necessary materials, supplies, or permits, inability of a gas customer of Buyer to receive gas because of force majeure conditions, and *other causes whether of the kind herein enumerated or otherwise not reasonably within the control of the party claiming suspension.* It is understood and agreed that the settlement of strikes or lockouts shall be entirely within the discretion of

the party having the difficulty and that the above requirements that any force majeure shall be remedied with all reasonable dispatch shall not require the settlement of strikes or lockouts by acceding to the demands of the opposing party when such course is inadvisable in the discretion of the party having the difficulty. (Emphasis added)

*Performance*

11. First production dedicated to Continental under the Gas Purchase Contract commenced in September, 1972; and, commencing with such production Continental purchased under the contract from defendants, on a daily basis, natural gas attributable to the interest of defendants, and Continental paid defendants, at the price provided in the Gas Purchase Contract, for all such gas. (Galbraith Testimony and affidavit paragraph 5).

12. The Gas Purchase Contract was performed by defendants-sellers and plaintiff-purchaser until on or about March 31, 1976, when defendants ceased deliveries of their interest in gas produced from the designated leaseholds and lands. At the time of such cessation of deliveries, average daily volumes being delivered to Continental approximated 1,367 Mcf of gas. (Galbraith Testimony, Tr. p. 27.)

13. Upon termination of deliveries to Continental, defendants commenced delivering the gas to a third party, Louisiana Intrastate Gas Corporation, on a daily basis, at a price approximately five times the contract price under the Gas Purchase Contract. Compare the Gas Purchase Contract initial price of 31.9 cents per Mcf with the price received from Louisiana Intrastate Gas Corporation of $1.35 per MMBTU, which equates to $1.53 per MCF. (Galbraith Affidavit, paragraph 5, and testimony of J. D. Tufts, Tr. p. 65.)

*Unforeseen Circumstances*

14. Following execution of the 1972 contract, there was a drastic and unforeseen rise in the price and value of natural gas within the Reddell Field. By December 1, 1973, the price of gas had risen to 60 cents per MCF, or double the price set forth in the 1972 contract; by December 1, 1974, the price had risen to $1.18 per MCF; and by November 30, 1975, the price had risen to $1.35 per MMBTU (approximately $1.53 per MCF). Elsewhere along Continental's Louisiana Gas System the price of gas rose even higher, to current prices of $2.00 and $3.00 per MCF.

15. The occurrence and magnitude of this drastic rise in price were not foreseen by any of the parties at the time of entering the 1972 contract. The defendants did not foresee it; and Continental has not suggested that it was able to predict such a drastic rise in price. The defendants also introduced into the record twenty-six other gas purchase contracts entered into by Continental along its Louisiana Gas System during 1971 and 1972, and in 1973, and the gas purchase contract entered into between Inexco and LIG in 1971, which show that other companies, among them Humble, Chevron, Exxon, Gulf, Phillips, Amoco, Atlantic Richfield, and H. L. Hunt, also entered into gas contracts in the same manner as the 1972 contract for long terms and with reference to gas prices as they existed at that time, and without anticipation of any drastic rise in price during the contract term.

16. The occurrence and magnitude of the drastic price rise could not reasonably have been foreseen by any of the parties at the time of the 1972 contracting. While an energy crisis and shortage of natural gas of national proportions had already occurred and had received considerable public recognition prior to the execution of the Gas Purchase Contract (*see* e. g. *Federal Power Commission v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 456 F.2d 326, 328 (5th Cir. 1972); *Natural Resources Defense Council, Inc. v. Morton*, 337 F.Supp. 165 (D.D.C. 1971)), that energy crisis and gas shortage had manifested themselves by early 1971 in the Reddell Field only to the extent of a price rise of gas being sold in

the field from 11 cents per MCF for sales in 1963 to 28.5 cents per MCF for sales as of January 1, 1971. This rise of about 250% over an eight year period could not reasonably have given reason to expect a further rise of approximately 500% over a three year period (from 1972 through 1975).

17. On September 1, 1974, LIG, the other gas purchaser in the Reddell Field, amended its 1971 gas contract with Inexco to increase the price for all "new gas" from 28.5 cents to a sum which, in actual practice, has been approximately $1.25 per MMBTU. Following this price increase by LIG, a fieldwide unit was created within the Reddell Field, and a Joint Operating Agreement executed to provide for operation of the unit by Inexco. Under this Joint Operating Agreement, the LIG price increase was available to all working interest owners within the field (including Continental) except defendants, and with this higher price for "new gas" the other working interest owners (including Continental) voted to drill 5 additional new wells and to undertake the reworking of 7 existing wells, all of which was economical at the LIG price for any new gas discovered but which was at enormous loss and expense to defendants under the 1972 contract.

On October 23, 1975, the defendants asked Continental to amend the 1972 contract to provide an increase in price comparable to that provided in the LIG amendment, but Continental refused. Continental's refusal to amend the 1972 contract was at the same time that Continental was itself obtaining amendments to its own gas contracts with its large industrial customers so as to greatly reduce its fixed gas delivery obligations, and to provide an increase in price to current market values for certain volumes of gas to be delivered.

18. Following Continental's refusal to amend the 1972 contract, defendants terminated performance of the contract effective April 1, 1976, and on that date began selling the gas to LIG, on a day-to-day basis.

19. Although gas deliveries to Continental ceased on or about March 31, 1976, Continental was not made aware of the cessation of deliveries until on or about June 2, 1976, when written notice was received by Continental from the operator in the field concerning entitlement to gas production from the field, and the allocation of produced volumes to the various owners. (Galbraith Affidavit, paragraph 13).

*Effects of Nonperformance*

20. Continental owns and operates an intrastate natural gas pipeline system located in southwestern Louisiana, known as its Louisiana Gas System. Continental buys natural gas, transports it in the pipeline system, and sells it to system customers. These customers include seven industrial users in the vicinity of Lake Charles and Gillis, Louisiana, as well as the Town of Eunice, and approximately 200 agricultural and individual users. Continental itself uses approximately 40 to 50 thousand MCF daily in its own refinery, petrochemical, and other plant facilities located in the Lake Charles and Gillis, Louisiana areas. Continental's daily sales or use from the pipeline system approximate 182,000 MCF, and contract rights of several of the large industrial customers to receive daily volumes of natural gas continue until the mid-1980's (Galbraith Affidavit, Paras. 14 and 17).

21. The supply of natural gas for Continental's Louisiana Gas System comes from its 100 to 150 contracts under which it purchases gas from producers in fields in south Louisiana accessible to the Louisiana Gas System. The Gas Purchase Contract involved in this action is one of these contracts, and with the exception of a few contracts under which large volumes of gas are taken into the system, the gas deliveries made under the Gas Purchase Contract are an average, or a high average, of the daily volumes taken by Continental under the other gas purchase contracts under which gas is supplied to its pipeline system. (Galbraith Testimony, Tr. p. 27.)

22. At the time of termination of the 1972 contract the average daily deliveries of gas under the contract were 1,376 MCF per day—less than 1% of the average daily volume of gas received into Continental's Loui-

siana Gas System. This volume of gas is not essential to the continued operation of the Louisiana Gas System, and that system would continue in operation regardless of whether deliveries of this gas are immediately resumed. Since April 1, 1976, Continental has also been able to meet all contractual commitments to customers, and has had no forced reduction or curtailment of deliveries to customers since that date.

23. There is considerable evidence in the record as to the volumes of gas which Continental presently has "in storage" in the ground, or which Continental has a right to receive under forward trade agreements with others. For example, Continental "underproduces" its own wells at 90% of their daily deliverability, with the result that approximately 10% of the gas which could be produced and delivered each day remains "stored" in the ground. The average daily deliverability of Continental's wells is approximately 30,000,000 cubic feet per day, and Continental thus stores in the ground approximately 3,000,000 cubic feet of gas each day—two times the average daily volume under the 1972 contract. Continental has also "forward traded" gas for redelivery in the future, and there is a current balance of gas due for redelivery to Continental of approximately 2,836,883,000 cubic feet—a volume equal to deliveries under the 1972 contract for over 5½ years.

24. The record also shows that since termination of the 1972 contract, Continental has had available and has delivered to customers "excess" gas in volumes far greater than that covered by the 1972 contract. For example, on April 1, 1976, Continental entered into a contract to supply gas to Varibus Corporation "as and when" excess gas was available, and since that date Continental has delivered volumes of gas to Varibus each month which are approximately 36–37 times the volumes under the 1972 contract. The record also reflects that since 1975 in the case of Olin, and since 1974 in the case of PPG and Firestone, Continental has had an option to supply most, if not all, of the energy requirements of those customers in fuel oil, rather than in gas, but to date Continental has chosen to supply all requirements in gas.

25. The record further shows that even under Continental's most conservative reserve estimates, Continental does have sufficient gas supplies to meet its *non-substitutable gas demand* (i. e., Continental's minimum gas supply obligation, above which Continental has the option of supplying requirements in fuel oil) for all of 1977, and at least through the first half of 1978.

26. The record also reflects that on September 1, 1976, the defendants tendered to Continental, for sale and delivery, all of the gas covered by the 1972 contract (except the ½ of 1% attributable to the interest of the Hibernia National Bank), but to date Continental has not accepted that tender. The Court feels that if Continental actually needed the gas it would have accepted this tender and either used the gas to fulfill customer requirements now, or forward traded the gas for redelivery in the future. Crutcher-Tufts Corporation also offered its Unit "A" gas production for sale to Continental in December of 1976, for a period of up to 2 or 3 years, but Continental elected to purchase this gas for only a period of six months. Mr. Frank Carroll, who handled this purchase for Continental, testified that Continental declined to purchase this Unit "A" production for a longer period because Continental wished to wait and see what the price rise in the field would be under the scheduled amendment to the Inexco-LIG contract on July 1, 1977. As Mr. Carroll explained, if the price rise was too high, Continental would prefer to do without the gas.

27. Plaintiff Continental presently has enough daily deliverability of natural gas from its system to supply the current needs of its system customers, and will have enough such deliverability to continue to supply these daily needs on a short-term basis without the gas volumes which Continental contracted to purchase from defendants. Nevertheless, Continental suffers some injury from the failure of defendants to deliver the gas volumes in question. First, replacement of these volumes in-

volves producing from other reserves attached to Continental's pipeline system at increased levels, in order to satisfy daily system demands, and such increased production means that gas supplies which otherwise would have been available in the future to help satisfy needs of the system, when those needs cannot be met by daily deliverability, will not be available at such future time. Second, the Gas Purchase Contract is a long-term supply of natural gas for Continental's pipeline system, and in the operation of the pipeline such long-term supplies make possible the "forward trading" of gas, so that gas presently available but not needed can be exchanged with third parties for gas supplies in the future. Thus, such long-term gas, if it is available, can be provided to third parties under an arrangement calling for the redelivery of the gas to Continental at some future time. Such "forward trading" or exchanging of present supplies in return for redelivery of supplies in the future is important to the flexibility needed by the pipeline system to deliver on a daily basis the requirements of the system customers and at the same time avoid an excess supply in the pipeline. Third, the Continental system may suffer a shortage of gas as early as the spring of 1977; for considering the cold weather in early 1977 and resultant increased energy demand, the availability of fuel oil to satisfy a portion of system customers' demands is uncertain. (Galbraith Testimony, Tr. pp. 19–25; Galbraith Affidavit, paras. 16, 20).

28. Continental also faces the possibility that if defendants are to be permitted to terminate gas deliveries to Continental under the Gas Purchase Contract, such action could have the effect of encouraging other sellers-suppliers to the Louisiana Gas System to take similar action. The injury to Continental could be serious, and its supply-demand situation could deteriorate rapidly, if additional sellers cease deliveries to Continental of gas volumes being delivered under their gas sales contracts.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and under 28 U.S.C. Section 1332 jurisdiction over the subject matter based on diversity of citizenship between plaintiff and all defendants.

2. The Fifth Circuit has enumerated four factors which must be considered by this Court in exercising its discretion to determine what disposition should be made of a Motion for a Preliminary Injunction under the provisions of F.R.Civ.P. Rule 65. Before awarding a preliminary injunction, the Court must consider the answers to the following questions:

(1) Is there a substantial likelihood that plaintiffs will prevail on the merits?

(2) Is there a substantial threat that plaintiffs will suffer irreparable injury if interlocutory injunctive relief is not granted?

(3) Does the threatened injury to plaintiffs outweigh the threatened harm the injunction may do to defendants?

(4) Will the granting of a preliminary injunction disserve the public interest?

*Buchanan v. United States Postal Service*, 508 F.2d 259, 266 (5th Cir. 1975); *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).

*The Likelihood of Prevailing on the Merits*

3. Continental has not shown that it is likely to prevail on the merits of this controversy inasmuch as defendants have shown the occurrence over a relatively short period of time of a drastic price rise in the price of gas after execution of the Gas Purchase Contract, which seems likely to qualify as a force majeure event under the contract provision that force majeure includes not only the particular events specified in the contract but also "other causes whether of the kind herein enumerated or otherwise not reasonably within the control of the party claiming suspension [of his duties to perform under the contract]."

4. While a natural gas energy crisis of sorts had been recognized for some time prior to the execution of the Gas Purchase Contract in 1972, *see* finding of fact no. 16, *supra*, the drastic rise in price of a magnitude of nearly 500% over a short period of

time was not foreseen or contemplated by either of the parties at the time the contract was executed in April 1972 and amended in December 1972. The contract was made in 1972 under conditions of rising but not skyrocketing gas prices. The enormous elevation of gas prices after the contract was executed was not anticipated by the parties and was beyond their control.

5. A venerable principle under Louisiana contract law is that a contract must be construed in light of the conditions and surrounding circumstances existing at the time of contracting, together with the terms and language used. *Cooley v. Meridian Lumber Co.*, 195 La. 631, 197 So. 255, 258 (1940); *C. A. Andrews C. Co. v. Board of Directors of Public Schools*, 151 La. 695, 92 So. 303, 304 (1922).

6. Since persons may be expected to contract with one another on a basis equitable to each, a contract should not be given a construction that will work a hardship on one of the parties, where this may be avoided without defeating in whole or in part the intention of the parties at the time of execution of the agreement. *Coyle v. Louisiana Gas and Fuel Co.*, 175 La. 990, 144 So. 737, 742 (1932). A court should not construe the terms of a contract in such a manner as to lead to absurd or unreasonable consequences. *Ainsworth v. Association Life Ins. Co., Inc.*, 325 So.2d 708 (La. App.), cert. den. 328 So.2d 105 (La.1976); *Texaco Inc. v. Vermilion Parish School Board*, 244 La. 408, 152 So.2d 541 (1963).

7. In light of the pertinent Louisiana standards of contract interpretation, it is not likely that plaintiff could show that the parties reasonably intended the Gas Purchase Contract's force majeure provision not to include a drastic and unforeseen price rise of the magnitude of 500% over a three year period which was beyond the control of either party.

8. Because of our conclusion that plaintiff is not likely to prevail in showing that the force majeure clause of the Gas Purchase Contract was not intended to cover the rapid, exorbitant price rise here an issue, the Court pretermits consideration of whether plaintiff would be likely to prevail in convincing a court of equity to become a participant in the specific enforcement of a provision requiring a party to continue to sell natural gas for only one-fifth of its present value pursuant to a contract made without expectation or reason to expect that a drastic price rise would shortly thereafter occur. The Court is, however, mindful of the scholarly analysis and recommendations set forth in "The Energy Crisis and Economic Impossibility in Louisiana Fuel Requirements Contracts: A Gameplan for Reform", 49 Tul.L.Rev. 605 (1975).

*Irreparable Injury*

9. The gas covered by the 1972 Gas Purchase Contract is significant but not essential to the continued operation of Continental's Louisiana Gas System and Continental will not suffer irreparable injury if resumption of deliveries is not immediately ordered. Natural gas is not a unique commodity but, rather, may be and is continually purchased on the open market. Alternative sources of gas supply do exist, and any need which Continental might have for gas could be satisfied readily by purchase upon the open market. Continental's claim is clearly compensable in money damages and the extraordinary remedy of preliminary injunctive relief is neither required, nor warranted, in this case. *Marthinson v. King*, 150 F. 48, 52 (5th Cir. 1906). Continental has also made deliveries in excess of the amount required to be delivered to some customers, indicating that Continental has to some extent had an excess of natural gas. The fact that Continental now enters short-term rather than long-term contracts with its suppliers tends to undercut Continental's contention that it requires a long-term commitment from the instant defendants in order to engage in long-term planning.

10. The long delay between the cessation of deliveries to Continental on April 1, 1976, and Continental's filing of this motion for preliminary injunctive relief in January of 1977, also militates against

Continental's claim of irreparable injury. *Irving J. Dorfman Co. v. Borlan Industries,* 309 F.Supp. 21, 26 (S.D.N.Y.1969); *Thomas Wilson & Co. v. Irving J. Dorfman Co.,* 268 F.Supp. 711, 714 (S.D.N.Y.1967), aff'd 433 F.2d 409 (2nd Cir. 1970); *Poe v. Michael Todd Co.,* 151 F.Supp. 801, 803 (S.D.N.Y. 1957); *Gianni Cereda Fabrics, Inc. v. Bazaar Fabrics, Inc.,* 335 F.Supp. 278, 280–281 (S.D.N.Y.1971); and *Brookhaven Housing Coalition v. Kunzig,* 341 F.Supp. 1026, 1030 (E.D.N.Y.1972).

### Balance of Harms

11. The harm to the defendants if the preliminary injunction is granted would outweigh any harm to Continental if the injunction is denied. Continental is engaged in oil and gas operations on a world-wide basis, of which its Louisiana Gas System is only a part. The volumes of gas covered by the Gas Purchase Contract represent less than 1% of the average daily deliveries into or from the Louisiana Gas System and are available on the open market. Continental's huge system will not be seriously disrupted by denial of preliminary injunctive relief. Defendants on the other hand comprise a few individuals, and one corporation 90% of whose holdings are located in the Reddell Field, which is the subject of this lawsuit. While awaiting the trial on the merits, defendants' income from gas production would be cut 80% if a preliminary injunction were granted to mandate their resumption of deliveries at a price 80% below the present market value. The defendants have also been forced to participate, and may be forced to participate again, in the drilling of new wells, and in the reworking of existing wells which are at tremendous economic loss to the defendants under the 1972 contract. No such loss, however, is shared by Continental. Under these circumstances, the defendants would suffer considerably more from a grant of the preliminary injunction than Continental will suffer from its denial. Thus, when the relative equities are balanced it is clear to the Court that the preliminary injunction should be denied. *Eutectic Welding Corp. v. Zeisel,* 11 F.R.D. 78, 80 (D.N.J.1950);

*Guardian Life Insurance Co. v. Guardian Nat. Life Insurance Co.,* 158 F.Supp. 623, 627 (E.D.La.1958); and *Coffee Dan's Inc. v. Coffee Don's Charcoal Broiler,* 305 F.Supp. 1210, 1216, 1217 (N.D.Cal.1969).

### Public Interest

12. The public interest will not be disserved by denial of a preliminary injunction in the instant case. Undeniably a strong public interest informs the energy industry. Address by President Ford, World Energy Conference, Sept. 23, 1974, in U.S. Dept. of State Bull. No. 1842, A Global Approach to the Energy Problem (1974). The State of Louisiana has itself manifested a strong concern to prevent waste and wasteful utilization of energy resources, including intrastate natural gas, through passage of Louisiana's Natural Resources and Energy Act of 1973, LSA R.S. 30:501 et seq. Allowing plaintiffs to purchase such gas at an extremely cheap price will certainly not encourage them to be as careful in avoiding waste as if they were required to pay the gas's actual market value. We have seen no evidence that Continental has passed on to the public a benefit in the form of prices below market value made possible because Continental itself was able to obtain supplies of natural gas at extremely low prices. While the dispute here necessarily entails the public interest inasmuch as it involves energy, the present controversy is essentially a private contractual dispute about how the contracting parties will share the consequences of the energy crisis and the attendant mushrooming of energy values. The public interest does not dictate the drastic remedy of preliminary injunctive relief in such circumstances.

13. For all of the foregoing reasons, Continental's Motion for a Preliminary Injunction is denied.