**In the Matter of Bruce M.H. CLARK, Debtor.**

**Bruce M.H. CLARK, Appellee,**

v.

**FIRST CITY BANK, Appellant.**

**No. 89–3443.**

United States Court of Appeals, Fifth Circuit.

Dec. 29, 1989.

Emile L. Turner, Jr., Turner, Young & Nebbler, New Orleans, La., for appellant.

M. Arnaud Pilié, John M. Holahan, New Orleans, La., for appellee.

Sargent Karch, Baker & Hostetler, Brian S. Harvey, Washington, D.C., for Nat. Football League Council, amicus curiae.

David R. McDaniel, J. William Becknell, Jr., Metairie, La., for New Orleans Saints, amicus curiae.

Before GARZA, WILLIAMS, and DAVIS, Circuit Judges.

**GARZA, Circuit Judge:**

Appealing the district court's reversal of the bankruptcy court's decision, the appellant asserts that the district court erred in finding Clark's post-petition earnings not a part of the bankruptcy estate. Finding no error in the district court's analysis, we AFFIRM.

### I. The Facts

Bruce Clark ("Clark") is a football player for the New Orleans Saints ("Saints"), one of the 28 member clubs of the National Football League ("NFL"). On October 20, 1988, Clark filed a petition for relief under Chapter 11 of the Bankruptcy Code, and on December 1, 1988, he converted the proceeding to one under Chapter 7.[1]

At the time of the filing in bankruptcy, Clark owed sums of money to First City Bank and Pontchartrain State Bank, which form the motivation for this appeal. As of December 14, 1988, the Saints owed Clark $370,625 under his 1988–89 season contract.[2] This appeal has national implications in that the contract in question is the form contract used by all twenty-eight NFL teams and the League's players.

On December 29, 1986, the Saints and Clark negotiated and executed three separate one year contracts for the years 1988–89, 1989–90, and 1990–91. Besides the basic NFL Player Contract, Clark bargained for and received additional addenda, to-wit:

a) incentive bonuses;
b) salary advance clause;
c) loan forgiveness;
d) one-year skill guarantee.

All three contracts contained identical attachments and were to become effective on the first day of February of each year and expire one year later. Pursuant to Paragraphs 5 and 6 of the 1988–89 contract, Clark's salary was $575,000 payable in 16 equal weekly installments of $35,937.50

---

**1.** Clark contends that conversion of a Chapter 11 proceeding to a Chapter 7 proceeding dates back to the October 20, 1988 filing of the Chapter 11 proceeding under Bankruptcy Rule 1019. No specific objections were made to this contention.

**2.** Clark's salary under his 1988–89 contract was $575,000; for 1989–90, $625,000; for 1990–91, $650,000. For the 1988–89 season, he was paid $35,937.50 for each of the Saints' sixteen games (as well as $4,878 for attending training/mini camp and preseason workouts). As of October 20, 1988, the filing date, he had played seven games, and nine games remained in the season.

each over the course of the 16–game regular season schedule. At the time of Clark's filing of his petition, seven of the sixteen games had been played.

## II. The Issue

The issue is whether the salary corresponding to the remaining nine games constitute "earnings from services performed by an individual debtor after the commencement of the case" within the meaning of Section 541(a)(6) of the Bankruptcy Code. 11 U.S.C. § 541(a)(6).

## III. The History

The Bankruptcy Court, in essence, held that the skill guarantee renders inoperative the provision of the NFL Player Contract wherein the Debtor is employed as a "skilled football player" and is required to maintain a satisfactory level of skill or performance or risk termination of the contract and its attendant monetary benefits. Thus, the bankruptcy court held that the skill guarantee superseded the entire contract and all of the remaining salary was part of the bankruptcy estate under Section 541(a)(6) of the Code. As a result of this construction, the bankruptcy court held that the salary was earned immediately upon Clark passing the physical examination at the pre-season training camp.

On appeal, the United States District Court for the Eastern District of Louisiana reversed the Bankruptcy Court's decision. 100 B.R. 317. The district court read the contract as a whole and did not hold the skill guarantee clause to control the entire contract, but merely to control the particular section concerning skill, performance and conduct. The district court held the post-petition salary was not part of the bankruptcy estate and was earned upon weekly compliance with the contract. Further, the district court held that Clark had an ongoing obligation to perform services for the Saints under the contract which were not nullified by the skill guarantee.

## IV. The Analysis

In order to determine the construction of the contract in light of the addendum, a close examination of each is needed. The pertinent part of the skill guarantee is:

> *GUARANTEE.* Despite any contrary language in this NFL Player Contract, Club agrees that for the year *1988* only it will pay Player the full salary provided in Paragraph 5, including any deferred salary applicable to this contract, despite the fact that, in Club's judgment, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, and Player's contract is terminated via the NFL waiver system. [Emphasis added]

> *PHYSICAL CONDITION.* This guarantee by Club will not become effective unless and until Player passes Club's physical examination for the year *1988*.

What fuels this dispute is a clash between the skill guarantee addendum and Section 541(a)(6) of the Bankruptcy Code, which provides:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case. (Emphasis added).

The controlling question is when the earning took place, which can only be answered by determining the interaction of the skill guarantee with the rest of the NFL Player Contract.

As the guarantee specifically states, it only controls over contrary language in the NFL Player Contract. The only language of the NFL Player Contract that is contrary to that of the skill guarantee is the language contained in Paragraph 11, which permits a club to terminate a player's contract for "skill or performance" reasons with no further financial obligations to the player.[3]

---

**3.** Paragraph 11 of the NFL Player Contract provides:

While performance of a professional football player is unquestionably a large part of his contract, there are other ongoing obligations contained within the NFL Player Contract that Clark must continue to perform.[4]

Another addendum to Clark's NFL Player Contract for the 1988–89 season, captioned "LOAN FORGIVENESS," provides for incremental forgiveness of a $725,000 loan by the Saints to Clark over the course of the 1988–89 regular season. Clark's entitlement to this incentive is made conditional upon his "fulfilling his contractual obligations ... by playing or being available to play for club." For 1988, the loan forgiveness addendum calls for forgiveness of the loan at the rate of $11,328.12 for each of the 16 regular season games played by the Saints during the 1988–89 season. Forgiveness is made "upon conclusion of [the] regular season."

Paragraph 23 of the contract specifically states that the "[c]ontract is made under and shall be governed by the laws of the State of Louisiana." Under Louisiana law, a contract must be construed in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La.Civ.Code Ann. art. 2050. Further, a contract must be construed as a whole and not by clauses, sentences, or paragraphs. *Texaco, Inc. v. Vermilion Parish School Board*, 244 La. 408, 152 So.2d 541 (1963).

The "loan forgiveness" addendum further demonstrates that the parties did not contemplate that Clark would totally exhaust his football-playing obligations at the moment he passed the pre-season physical examination. Clark's football obligations continued through all of the events listed in Paragraph 2, specifically "pre-season training camp, all Club meetings and practice sessions, and all pre-season, regular season and post-season games."

Under Louisiana law, "a court should not construe the terms of a contract in such a manner as to lead to absurd or unreasonable consequences." *Continental Oil Co. v. Crutcher*, 434 F.Supp. 464, 471 (E.D.La. 1977). *Oil Field Supply v. Gifford Hill & Co.*, 204 La. 929, 16 So.2d 483 (1944). A holding that Clark had satisfied his contractual obligations and was entitled to $575,000 the moment after passing his medical exam would certainly be unreasonable and possibly absurd.

SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's Roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's Roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this Contract.

4. Paragraph 2 of the Contract requires Clark to:
   1. Devote his best efforts to the Club;
   2. Conduct himself on and off the field in an appropriate manner;
   3. Report promptly for and participate fully in the Club's official pre-season training camp;
   4. Report promptly for and participate fully in all Club meetings and practice seminars;
   5. Report promptly for and participate fully in all pre-season, regular-season and post-season football games scheduled for or by the Club.
   6. If invited, practice for and play in any all-star football game sponsored by the League; and
   7. Refrain from participating in any football game not sponsored by the League, unless he receives prior approval from the League.

Paragraph 3 of the Contract requires Clark to:
   8. Refrain from engaging in any activity other than football which may involve a significant risk of personal injury, unless he has the prior written consent of the Club; and
   9. Represent that he has special, exceptional and unique knowledge, skill, ability and experience as a football player.

Paragraph 4 of the Contract requires Clark to cooperate with the news media and participate in reasonable promotional activities of the Club and League.

Paragraph 8 of the Contract requires Clark to:
   10. Maintain himself in excellent physical condition;
   11. Undergo physical examinations by the Club physician;
   12. Make full and adequate disclosure of any physical or mental conditions which might impair his performance;
   13. Respond fully and in good faith when questioned about conditions which might impair his performance; and
   14. Maintain his excellent physical condition to the satisfaction of the Club Physician.

Consequently, we construe the contract to have been ongoing and not satisfied by the simple completion of the medical exam. As a result, the district court properly reversed, holding that the earnings were prorated throughout the regular season, game by game, and therefore, seven (7) games' salary was pre-petition, and nine (9) games' salary was earned post-petition. Thus, the salary payments received post-petition may not be considered as part of the bankruptcy estate under Section 541(a)(6).[5]

## V.  The Calculation

If the contract is construed not to be essentially performed upon satisfaction of the medical exam, then when exactly was the money earned?  Our focus is again turned to the contract and the intent of the parties.  Under the contract, the salary payments were distributed to Clark during the regular season at $35,937.50 per game, notwithstanding his prior assignments. The only monies distributed for training camp and pre-season play were for travel, food, and lodging expenses.

Appellant asserts that the ongoing duties are imposed on Clark throughout the year and not simply during the regular season. Thus, appellant asserts that the earnings should be divided on a calendar year scale rather than the regular football season scale used by the district court.  However, as this case is still one of contract construction, the intent of the parties is clear in the contract.  Paragraph 6 provides for payment of player's salary "in equal weekly or biweekly installments over the course of the regular-season period commencing with the first regular-season game played by Club" (emphasis added).

The district court's analysis and decision to use a game by game system for proration of the earnings was correct and without error.  The district court correctly looked to the expressed intent of the parties embodied in the contract.

## VI.  The End Result

The district court correctly construed the contract to avoid the absurd result of Clark earning $575,000 for passing a pre-season physical examination.  The Contract, together with its addenda, contemplated ongoing obligations throughout the season, which comprised the time frame for payment.  The sixteen regular season games were the elected intervals, which directly corresponded to the contractual duties. Accordingly, the district court is in all things AFFIRMED.

---

**5.** *See Matter of Hellums,* 772 F.2d 379, 381 (7th Cir.1985) ("Post-petition wages are not property of the estate of a Chapter 7 bankrupt", under 11 U.S.C. § 541(a)(6)); *In re Sloan,* 32 B.R. 607, 611 (Bkrtcy.E.D.N.Y.1983) ("Where a debtor derives post-petition commissions under a pre-petition contract, and such commissions are dependent upon the continued services of the debtor, they do not constitute property of the estate", under Section 541(a)(6)).